**William H. GREEN et al., Plaintiffs,**

v.

**John B. CONNALLY et al., Defendants,**

v.

**Dan COIT et al., Intervenors.**

**Civ. A. No. 1355–69.**

United States District Court,
District of Columbia.

June 30, 1971.

———◆———

Frank R. Parker, Jackson, Miss., and James Robertson, Washington, D. C., for plaintiffs.

Johnnie M. Walters, Asst. Atty. Gen., Tax Div., Richard M. Roberts, Deputy Asst. Atty. Gen., Tax Div., Stanley F. Krysa, Trial Atty., Tax Div. and Jack B. Teplitz, Dept. of Justice, for defendants.

George S. Leonard, of Leonard, Clammer & Flues, Washington, D. C., for intervenors.

Before LEVENTHAL, Circuit Judge, and WADDY and PRATT, District Judges.

## OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF ORDER FOR DECLARATORY RELIEF AND PERMANENT INJUNCTION

LEVENTHAL, Circuit Judge:

Plaintiffs, Negro Federal taxpayers and their minor children attending public schools in Mississippi, brought this class action on May 21, 1969, seeking to enjoin the Secretary of the Treasury and Commissioner of Internal Revenue from according tax exempt status to private schools in Mississippi which exclude Negro students on the basis of race or color. They sought a declaration (1) that granting tax exempt status to such schools is violative of the provisions of the Internal Revenue Code of 1954 governing charities and charitable contributions; or (2) that if granting such status is authorized by the Code, then to that extent Sections 170 and 501 of the Code are unconstitutional.

## I. PRIOR DEVELOPMENTS

In our Opinion issued January 12, 1970, in support of our Order for Preliminary Injunction, we concluded that these tax benefits and deductions "mean a substantial and significant support by the Government to the segregated private school pattern," and that accordingly plaintiffs had "a reasonable probability of success" on the merits of their constitutional claims.[1]

On January 21, 1970, we granted the Motion to Intervene filed by Intervenors, Dan Coit, et al., as representatives of the class of parents and children who support or attend private, nonprofit, hitherto tax exempt schools in Mississippi having an enrollment consisting only of members of the white race and established as an alternative for white students seeking to avoid desegregated public schools.[2]

On the same day we granted Plaintiffs' motion to compel discovery, and Defendants have responded to requests for admissions and Plaintiffs have taken depositions. On June 26, 1970, we entered a supplemental order requiring defendants to suspend advance assurances of deductibility of contributions, previously given to segregated private schools in Mississippi, unless and until the Internal Revenue Service (IRS) determined that these schools were not part of a system of private schools operated on a racially segregated basis as an alternative to white students seeking to avoid desegregated public schools. Intervenors' motion to set this order aside was considered afresh, after oral argu-

[1]. Green v. Kennedy, 309 F.Supp. 1127, 1134, 1132 (D.D.C.1970).

[2]. Motions to intervene filed by persons representing other classes were denied. Intervenors and the other movants appealed to the Supreme Court from the limited grant of intervention and from the January 13, 1970, preliminary injunction. The appeal was dismissed on June 15, 1970, sub nom. Cannon v. Green, 398 U.S. 956, 90 S.Ct. 2169, 26 L.Ed.2d 539 (1970).

ment on August 27, 1970, and denied on September 14, 1970. Intervenors appealed to the Supreme Court from the orders of this court of January 13, June 26 and September 14, 1970. The appeal was dismissed for want of jurisdiction on January 11, 1971. Coit v. Green, 400 U.S. 986, 91 S.Ct. 460, 27 L.Ed.2d 435 (1971).

In the midst of this litigation, the Internal Revenue Service changed its course with respect to segregated private schools. On July 10 and 19, 1970, the Service issued two Releases, discussed hereafter, announcing that "it can no longer legally justify allowing tax-exempt status to private schools which practice racial discrimination nor can it treat gifts to such schools as charitable deductions for income tax purposes." In testimony before the Senate Select Committee on Equal Educational Opportunity,[3] the Commissioner of Internal Revenue explained, "An organization seeking exemption as being organized and operated exclusively for educational purposes, within the meaning of section 501(c) (3) and section 170, must meet the tests of being 'charitable' in the common-law sense." As the IRS now construes the Code private schools which practice racial discrimination do not meet such requirements.

## II. THE INTERNAL REVENUE CODE PROHIBITS EXEMPTION AND DEDUCTIONS FOR RACIALLY DISCRIMINATORY PRIVATE SCHOOLS

■ Upon reflection, we have concluded that the plaintiffs were entitled at the filing of the complaint and are now entitled to a declaration that the Code requires the denial and elimination of Federal tax exemptions for racially discriminatory private schools and of Federal income tax deductions for contributions to such schools.[4]

A. *Code Provisions*

The relevant provisions of the Internal Revenue Code are as follows:

Internal Revenue Code § 170, 26 U.S.C. § 170.

(c) Charitable contribution defined. —For purposes of this section, the term "charitable contribution" means a contribution or gift to or for the use of—

\*　\*　\*　\*　\*　\*

(2) A corporation, trust, or community chest, fund, or foundation—

(A) created or organized in the United States or in any possession thereof, or under the law of the United States, any State, the District of Columbia, or any possession of the United States;

(B) organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes or for the prevention of cruelty to children or animals;

(C) no part of the net earnings of which inures to the benefit of any private shareholder or individual; and

(D) no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation.

A contribution or gift by a corporation to a trust, chest, fund, or foundation shall be deductible by reason of this paragraph only if it is to be used within the United States or any of its

---

3. Statement of Randolph W. Thrower, Commissioner of Internal Revenue before the Senate Select Committee on Equal Educational Opportunity, 91st Cong., 2d. Sess., August 12, 1970, at 1995.

　　The July 10 and 19, 1970, News Releases are reported respectively at 7 CCH 1970 Stand.Fed.Tax Rep. ¶¶ 6790, 6814.

4. Under IRS regulations, if a tax exempt status has been recognized by the Service,

revocation by the Service may operate only prospectively from the date of its notice contemplating withdrawal, 26 C.F.R. 601.201(n) (3) (iii), unless "the organization omitted or misstated a material fact, operated in a manner materially different from that originally represented, or engaged in a prohibited transaction. \* \* \*" 26 C.F.R. 601.201(n) (6) (i).

possessions exclusively for purposes specified in subparagraph (B).

Internal Revenue Code § 501, 26 U.S. C. § 501:

 (c) List of exempt organizations.— * * *

 \* \* \* \* \* \*

 (3) Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation, and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office.

█ The key words are not defined with particularity in the Code or Treasury Regulations. But clearly, the term "charitable" is used "in its generally accepted legal sense," Treas.Reg. § 1.501 (c) (3)–1(d) (2), and not in a street or popular sense (such as, e. g., benevolence to the poor and suffering). *See* H. Reiling, "What is a Charitable Organization?" 44 A.B.A.J. 525, 527 (1958). Thus "strong analogy" can be derived from the general common law of charitable trusts, at least for close interpretative questions. Girard Trust Co. v. Commissioner of Internal Revenue, 122 F.2d 108, 110 (3d Cir. 1941); Pennsylvania Co. for Insurance of Lives and Granting Annuities v. Helvering, 62 App.D.C. 254, 66 F.2d 284 (1933).

B. *Denial of Exemptions and Deductions May Be Required by Underlying Law of Charitable Trusts*

 There is at least a grave doubt whether an educational organization that practices racial discrimination can qualify as a charitable trust under general trust law. We need not decide that question, but brief discussion provides helpful perspective.

1. General Law of Charitable Trusts.

 Apart from tax advantages, the law bestows on charitable trusts many privileges not accorded their non-charitable cousins. As Bogert's text notes, these include: permission for the trust to be perpetual in duration; to inure to the benefit of beneficiaries who are not definitely ascertainable at creation of the trust or within the period of the rule against perpetuities; and to escape some of the rules regarding accumulations, as well as those against remoteness in vesting and suspension of the power of alienation. Special rules of construction are applied in an effort to support a charitable trust. And under the *cy pres* doctrine the courts modify charitable trusts to meet changing conditions in a way not permitted with regard to private trusts. "All these exceptions and exemptions imply more or less disadvantage to the community. The law must find in the trust which is to receive the name 'charitable' some advantages to the public which more than offset the detriments which arise out of the special privileges accorded to that trust.[5]"

 It is because society is "the real beneficiary of every charitable trust" that it is enforceable even though there are no ascertainable beneficiaries to bring an issue or controversy to the chancellor. It is the "public benefits arising from the charitable trust" that result in its enforcement by a public official, traditionally the Attorney General whose duties include protection of the people of the state in general.[6] And if the purpose of a trust does not merit classification as beneficial to the community and hence a charitable trust, then however honorable its purpose—say, a trust for the erection of monuments, the care

---

5. 4 G. Bogert, The Law of Trusts and Trustees §§ 361, 362 (2d ed. 1964).

6. 4 Bogert, *supra* note 5 § 411, p. 318; see § 362, p. 5 for the first sentence of this paragraph of opinion.

of graves, the support of animals, and in various states for the saying of masses,—there is only an "honorary trust" which the transferee may decline to fulfill and remit to the settlor or estate. There is no community benefit which permits the time and effort of a public official to be devoted to its enforcement.[7]

Underlying the law of charitable trusts is the conception, both in definition and requirement, that a "charitable" trust is one formed to serve the general welfare and be "beneficial to the community." Often cited is Ould v. Washington Hospital for Foundlings, 95 U.S. 303, 311, 24 L.Ed. 450 (1877), "A charitable use, where neither law nor public policy forbids, may be applied to almost any thing that tends to promote the well-doing and well-being of social man." The American Law Institute restates the doctrine thus: "A purpose is charitable if its accomplishment is of such social interest to the community as to justify permitting the property to be devoted to the purpose in perpetuity.[8]"

Calculations of community benefit are often difficult, and as time passes, conceptions of worthy purposes may change. "Because of this constant flux," notes one commentator,[9] "attempts to formalize the community benefit into abstract rules inevitably degenerate into a listing of ad hoc responses to particular situations." The list in the preamble to the Statute of Charitable Uses, 43 Eliz. I, c. 4 (1601), contained a fair collation of the then common charities. Other classical definitions, employing categories derived from the Statute, are set forth in the footnote.[10] But underlying any traditional listing of charitable purposes was the element that "accomplishment of the objects listed foreseeably redounded to community betterment." Annot. 12 A.L.R.2d 849, 855 (1950).

Trusts coming within Lord Macnaghten's first three categories (supra, note 10)—relief of poverty; advancement of education; advancement of religion— are recognized as beneficial to the community as a whole even though the class of persons benefiting directly is relatively small. When trusts come under the general, residual category ("other purposes beneficial to the community") it must be shown that the class of beneficiaries is large enough to establish the interest of the community in enforcement of the trust. Restatement (Second) of Trusts § 375, Comment a. And so, even several years before the July, 1970, change in tax policy as to educational charities, the IRS took the position that contributions to community recreation facilities would be deductible only if the facilities were open on a racially non-discriminatory basis.[11]

7. Restatement (Second) of Trusts § 124 (1959).

8. Id. § 368, Comment b.

9. Clark, Charitable Trusts, the Fourteenth Amendment and the Will of Stephen Girard, 66 Yale L.J. 979, 997 (1957).

10. Lord Macnaghten's oft-cited definition in Commissioners for Special Purpose of Income Tax v. Pemsel, [1891] A.C. 531, 583 stated:

"Charity" in its legal sense comprises four principal divisions: trusts for the relief of poverty; trusts for the advancement of education; trusts for the advancement of religion; and trusts for other purposes beneficial to the community, not falling under any of the preceding heads. The trusts last referred to are not the less charitable in the eye of the law, because incidentally they benefit the rich as well as the poor, as indeed, every charity that deserves the name must do either directly or indirectly.

Restatement (Second) of Trusts, § 368 (1959), spells out two additional categories:

Charitable purposes include
(a) the relief of poverty;
(b) the advancement of education;
(c) the advancement of religion;
(d) the promotion of health;
(e) governmental or municipal purposes;
(f) other purposes the accomplishment of which is beneficial to the community.

A leading American definition of charitable trusts appears in Jackson v. Phillips, 14 Allen 539, 556 (Mass.1867).

11. Rev.Rul. 67–325, 1967–2 Cum.Bull. 113.

Analysis of the contribution of a trust purpose to the benefit of the community must take into account broad principles of the general welfare, as expounded, *inter alia,* in constitutions, statutes, and court decisions. There may well be changes over time in the application of these principles to particular uses. For example, there was no mention of alleviating the suffering of animals in the Statute of Charitable Uses. Today it is recognized that the community has an interest in the prevention of cruelty to animals and societies formed for the prevention of cruelty to animals have been widely held charitable.[12] Changes in the courts' conceptions of what is charitable are wrought by changes in moral and ethical precepts generally held, or by changes in relative values assigned to different and sometimes competing and even conflicting interests of society.[13]

Scholarly authorities agree that the standards may change over time so that enumerated categories may not be immutably "charitable." Professor Bogert writes:[14]

> The courts should be left free to apply the standards of the time. What is charitable in one generation may be non-charitable in a later age, and vice versa. Ideas regarding social benefit and public good change from century to century, and vary in different communities.

While as a matter of form Professor Scott organized his treatise according to a set of traditional charitable categories, he cautions:

> The interests of the community * * vary with time and place. Purposes which may be regarded as laudable at one time may at other times be regarded as subserving no useful purpose or even as being illegal. So,

too, what in one community is regarded as beneficial to the community may in another be regarded as useless if not detrimental.[15]

Another writer notes that the ultimate test of an attempted charitable trust is not whether it fits into a traditional category but whether the court finds it "beneficial to the community." See Annot. 12 A.L.R.2d 849, 859 (1950).

> This new approach to charities does not mean that courts have abandoned their traditional favor towards charitable trusts. It simply means that the intrinsic merits of a proposed charity are issuable; and trusts are not to be upheld just because they come within a traditional category.

The courts are, of course, vigilant to inquire whether a charitable trust has become unenforceable as written because of lack of benefit to the community even assuming it was valid when executed. The testator or settlor is not given the authority to impose his judgment, however enlightened and reasonable when exercised, on future generations and in perpetuity, with assurance of enforcement by state officials, without authority in the courts to reassess the reasonableness of his purposes in the light of future conditions and public policies.

2. The Common Law Rulings Avoiding Enforcement of Purpose of Racially Discriminatory Private Education.

 All charitable trusts, educational or otherwise, are subject to the requirement that the purpose of the trust may not be illegal or contrary to public policy. This elementary principle, referred to by the Supreme Court in *Ould supra,* was restated as follows in the Restatement (Second) of Trusts § 377, Comment *c* (1959): "A trust for a pur-

---

12. 4 A. Scott, The Law of Trusts § 374.2 at 2905–06 (1967).

13. An 1895 English case held that a trust for the prevention of vivisection was a valid charitable trust, In re Foveaux, (1895) 2 Ch. 501, but in 1948 it was overruled by the House of Lords, which held that the purpose of such a trust was to

impede medical research and that it therefore could not be beneficial to the community, National Anti-Vivisection Society v. Inland Revenue Commissioners, (1948) A.C. 31.

14. 4 G. Bogert, *supra* note 5, § 369 at 63.

15. 4 A. Scott, *supra,* note 12, § 368 at 2855–56.

pose the accomplishment of which is contrary to public policy, although not forbidden by law, is invalid." This public policy doctrine operates as a necessary exception to or qualifier of the precept that in general trusts for education are considered to be for the benefit of the community. Otherwise, for example, Fagin's school for pickpockets would qualify for a charitable trust.

While in the past the traditional law of charities embraced educational trusts for the benefit of a racially defined class, there is grave doubt whether this rule has continuing vitality in view of current values which govern the application of charitable trust law. The cases indicate a trend that racially discriminatory institutions may not validly be established or maintained even under the common law pertaining to educational charities.[16] Professor Bogert's treatise has already reflected this shift.[17] While Professor Scott's treatise has not yet been revised so as to modify the earlier statement that a trust to educate persons of a particular race would nonetheless be charitable,[18] Professor Scott plainly recognizes the underlying rules that "[q]uestions of public policy are not fixed and unchanging, but vary from time to time and from place to place," [19] and that "[a] trust fails for illegality if the accomplishment of the purposes of the trust is regarded as against public policy in the community." [20]

Several cases have freed trustees and administrators of educational institutions from the necessity of following discriminatory provisions in gifts to their schools. Such discriminatory clauses were ignored as nullities, and the trusts were salvaged under the *cy pres* doctrine, avoiding reversion to residuary legatees, when Amherst and Stanford announced they would refuse to accept the gifts if the restrictive clauses were binding.[21] In 1964, Rice University brought an action in a Texas court against the Attorney General of Texas, seeking authority to ignore restrictions in its charter, and in the trust establishing the University, prohibiting the admission of Negroes. A jury made special findings of fact that the chief purpose of the University's benefactor was to create a first class educational institution and that the racial restrictions rendered this purpose impracticable. The court held the University trustees free to ignore the racial restriction in the trust and to admit all applicants without regard to race.[22]

Where racially restrictive clauses have not been recast the courts have used different techniques, differing in form and consequence, but unified in that each in its own way frustrated enforcement of

16. *See generally*, Annot. 25 A.L.R.3d 736 (1969); Nelkin, Cy Pres and the Fourteenth Amendment: A Discriminating Look at Very Private Schools and Not So Charitable Trusts, 56 Geo.L.J. 272 (1967); Spratt, Federal Tax Exemption for Private Segregated Schools: The Crumbling Foundation, 12 Wm. and Mary L.Rev. 1 (1970).

17. *Compare* G. Bogert, *supra* note 5, § 375 at 118 with 2 G. Bogert, The Law of Trusts and Trustees § 374 at 1165–66 (1st ed. 1935).

18. 4 A. Scott, *supra* note 12, § 370.6, p. 2879. He retains, however, the qualification that the class not be "so small that the purpose is not of benefit to the community." *Ibid.*

19. *Id.* § 377 at 2972.

20. *Ibid.*

21. Howard Savings Institution of Newark, New Jersey v. Peep, 34 N.J. 494, 170 A.2d 39 (1961) (Amherst); In re Estate of Ruth Snively Walker, No. 70195 (Cal. Super.Ct.1965) (Stanford).

22. Coffee v. William Marsh Rice University, 408 S.W.2d 269 (Tex.Civ.App. 1966), writ ref'd, aff'g Wm. Marsh Rice University v. Carr, 9 Race Rel.L.Rep. 613 (Harris Cy. Tex.Dist.Ct.1964).
Racial restrictions have been removed from trust instruments under the *cy pres* doctrine in Bank of Delaware v. Buckson, 255 A.2d 710 (Del.Ch.1969) (scholarships); Dunbar v. Board of Trustees of George W. Clayton College, 461 P.2d 28 (Colo.1969) (orphanage); and Wooten v. Fitz-Gerald, 440 S.W.2d 719, (Tex.Civ. App.1969) writ ref'd (trust for aged "white men.").

the racially discriminatory provisions as written. (1) In some instances, the courts have created new remedies, as in Sweet Briar Institute v. Button, 280 F. Supp. 312 (W.D.Va.1967), where the court enjoined the county and state attorneys from bringing actions under state law to enforce a racially restrictive provision in the will of the founder of the college on the grounds that such enforcement would be state action impermissible under the Fourteenth Amendment. (2) In other instances the courts have declined to afford traditional remedies, as in Commonwealth of Pennsylvania v. Brown, 392 F.2d 120 (3d Cir.), cert. denied, 391 U.S. 921, 88 S.Ct. 1811, 20 L.Ed.2d 657 (1968), the most recent chapter of the Girard College litigation, where the court held that the substitution of private trustees to carry out the racial exclusion by a city court was unconstitutional state action. (3) And in still other instances the courts have gone so far as to jettison the trust altogether, permitting the property to move to the reversionary beneficiaries or heirs. Evans v. Abney, 396 U.S. 435, 90 S.Ct. 628, 24 L.Ed.2d 634 (1970).

3. Construction of Congressional Intent in Federal Tax Law Provisions by Reference to Federal Public Policy.

There is merit in the general approach of interpreting these Code provisions by reference to common-law background, using that term in its broadest sense to include both the domain of equity courts and the on-going evolution of doctrine by the courts. If we were to follow the common law approach there would be a strong case for sustaining the interpretation of the Code announced in July 1970 by the IRS as reasonable in the light of the authorities we have cited.[23]

Taking into account the sensitive and crucial nature of the issue of racially discriminatory schools and the existence, as we shall relate, of a federal policy derived from Congressional enactment as well as the Constitution itself, it is our conclusion that the ultimate criterion for determination whether such schools are eligible under the "charitable" organization provisions of the Code rests not on a common law referent but on that Federal policy. In construing the Federal law that confers tax advantages upon educational charities, we are guided by two salient principles.

a. *Public Policy*

Before considering the more particular subject of charities, we refer to the general and well-established principle that the Congressional intent in providing tax deductions and exemptions is not construed to be applicable to activities that are either illegal or contrary to public policy. For example, the dependency deduction was construed in Leon Turnipseed, 27 T.C. 758 (1957), to disallow such a deduction if the relationship between the taxpayer and the "dependent" was in violation of local law. This was later codified in Section 152(b) (5) of the Code. *See also* Fuller v. Commissioner of Internal Revenue, 213 F.2d 102 (10th Cir. 1954) limiting the deduction for individual business losses (now § 165(c)).

A number of cases establishing public policy as a limitation on tax benefits have been concerned with the ordinary and necessary business expense deduction under § 162 of the Code. Commissioner of Internal Revenue v. Tellier,

23. The common law of charitable trusts could be used for construction of the Code even though the Code is applicable *e. g.*, to nonprofit corporations as well as trusts.
We are assuming *arguendo*, as did the Supreme Court in Evans v. Newton, 382 U.S. 296, 300, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966), that no constitutional difficulty is presented if a settlor or testator donates a school for the use of only one race.

We do not consider the constitutional question whether the use of state courts to supervise and enforce the state's provision of the special rules for charitable trusts, including notably suspension of the rule against perpetuities, constitutes "state action" that contravenes the Fourteenth Amendment when applied in behalf of racially discriminatory schools. *See* Clark, *supra* note 9.

383 U.S. 687, 694, 86 S.Ct. 1118, 16 L. Ed.2d 185 (1966); Tank Truck Rentals, Inc. v. Commissioner of Internal Revenue, 356 U.S. 30, 33–34, 78 S.Ct. 507, 2 L.Ed.2d 562 (1958); Commissioner of Internal Revenue v. Sullivan, 356 U.S. 27, 78 S.Ct. 512, 2 L.Ed.2d 559 (1958); Lilly v. Commissioner of Internal Revenue, 343 U.S. 90, 96–97, 72 S.Ct. 497, 96 L.Ed. 769 (1952). At issue in *Tank Truck Rentals* was the deductibility of fines paid for violations of state maximum weight laws. Disallowing the deduction, the Court held, "A finding of 'necessity' cannot be made, however, if allowance of the deduction would frustrate sharply defined national or state policies proscribing particular types of conduct, evidenced by some governmental declaration thereof." (356 U.S. at 33–34, 78 S.Ct. at 509). The state policies of protecting their highways from damage and insuring the safety of persons using them were "evidenced" by the state penal statutes. *Id.* at 34, 78 S.Ct. 507. Cautioning that "each case must turn on its own facts," the Court articulated that "the test of nondeductibility always is the severity and immediacy of the frustration resulting from allowance of the deduction. The flexibility of such a standard is necessary if we are to accommodate both the congressional intent to tax only net income, and the presumption against congressional intent to encourage violation of declared public policy." *Id.* at 35, 78 S.Ct. at 510.[24]

This public policy limitation on tax benefits applies *a fortiori* to the case before us, involving the charitable deduc-

tion whose very purpose is rooted in helping institutions because they serve the public good. The Internal Revenue Code does not contemplate the granting of special Federal tax benefits to trusts or organizations, whether or not entitled to the special state rules relating to charitable trusts, whose organization or operation contravene Federal public policy. This principle cannot be applied without taking into account that as to private philanthropy, the promotion of a healthy pluralism is often viewed as a prime social benefit of general significance. In other words, society can be seen as benefiting not only from the application of private wealth to specific purposes in the public interest but also from the variety of choices made by individual philanthropists as to which activities to subsidize.[25] This decentralized choice-making is arguably more efficient and responsive to public needs than the cumbersome and less flexible allocation process of government administration.[26]

In a recent article, Judge Friendly has stressed the value of this pluralism, noting the incongruity "if the extension of the helping hand of the government, even when the help is monetary, were to turn our lively pluralistic society into a deadly uniformity ruled by constitutional absolutes."

> Philanthropy is a delicate plant whose fruits are often better than its roots; desire to benefit one's own kind may not be the noblest of motives but it is not ignoble. It is the very possibility of doing something different than government can do, of creating an

---

24. Where there is no paramount declaration of government policy, the Court has allowed expense deductions pursuant to the Federal policy of taxing net income only. Lilly v. Commissioner of Internal Revenue, 343 U.S. 90, 72 S.Ct. 497, 96 L.Ed. 769 (1952); Commissioner of Internal Revenue v. Tellier, 383 U.S. 687, 86 S.Ct. 1118, 16 L.Ed.2d 185 (1966). In Commissioner of Internal Revenue v. Sullivan, 356 U.S. 27, 78 S.Ct. 512, 2 L.Ed.2d 559 (1958) the Court allowed a deduction for wages and rent paid out illegally under a state law (because made

in the operation of bookmaking enterprises) because it could find no federal policy disapproving of such expenses and because the deduction did not lessen the "sting" of the independent state law penalties.

25. *See, e. g.*, the sources collected in Rabin, Charitable Trusts and Charitable Deductions, 41 N.Y.U.L.Rev. 912, at 920–925 (1966).

26. *See* Saks, The Roll of Philanthropy: An Institutional View, 46 Va.L.Rev. 516, 524 (1960).

institution free to make choices government cannot—even seemingly arbitrary ones—without having to provide a justification that will be examined in a court of law, which stimulates much private giving and interest.[27]

The indulgence of individual whim or preference has values but like all principles it cannot be pushed beyond sound limits to extremes that cannot be approved. The individual philanthropist cannot be indulged in his own vagaries as to what is charitable; he must conform to some kind of norm, else he cannot obtain subsidy or tax exemption. Similarly, the general principle of a "desire to benefit one's own kind" is an acceptable incentive to philanthropy as applied to a wide range of causes. But it takes on a different and unacceptable hue when it is manifested as racial discrimination. We are persuaded that there is a declared Federal public policy against support for racial discrimination in education which overrides any assertion of value in practicing private racial discrimination, whether ascribed to philosophical pluralism or divine inspiration for racial segregation.

b. *Federal Policy Against Support for Racially Segregated Education*

[6, 7] The Code must be construed and applied in consonance with the Federal public policy against support for racial segregation of schools, public or private.

The sources and evidences of that Federal public policy are various. Perhaps the ultimate source is the strife-sprung national policy against slavery, culminating in its abolition in the Thirteenth Amendment. The Enabling Clause of that Amendment is a constitutional source for Congressional legislation "for abolishing all badges and incidents of slavery." Civil Rights Cases, 109 U.S. 3, 20, 3 S.Ct. 18, 28, 27 L.Ed. 835 (1883).

The constitutional strength of the government's interest in preventing even private racial discrimination is underscored by the recent decision in Jones v. Alfred H. Mayer Co., 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968), interpreting the Civil Rights Act of 1866, 42 U.S.C. § 1982, wherein that interest was held to prevail over the ordinary liberty of a citizen to buy and sell land and other property. *Cf.* Griffin v. Breckenridge, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971).

The policy against racial segregation in education was broadly proclaimed as to public education by the states in the historic decision in Brown v. Board of Education, 347 U.S. 483, 74 U.S. 686, 98 L.Ed. 873 (1954). That was a seminal case and it has had numerous progeny, the latest to issue being Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). In Bolling v. Sharpe, 347 U.S. 497, 500, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954), the companion case to *Brown* applying the prohibition against state school segregation to the Federal Government through the Fifth Amendment, the Supreme Court declared, "Segregation in public education is not reasonably related to any proper governmental objective * * *."

The national policy against support for segregated education emerged in provisions adopted by the Congress in the Civil Rights Act of 1964, 42 U.S.C. §§ 2000c to 2000d–4 (1964). Section 601 of the Act, 42 U.S.C. § 2000d provides that:

> No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.[28]

---

27. Friendly, The Dartmouth College Case and the Public-Private Penumbra, 12 Texas Quarterly (2d Supp.) 141, 171 (1969).

28. For state statutes prohibiting outright discrimination in either public or private schools, see note 37, *infra.*

We need not determine whether § 601 applies in terms to tax deductions and benefits. Certainly it is an expression of Federal policy against Federal support for private schools that practice racial discrimination. Another provision of the 1964 Act, calling on Federal officials to take action in order to terminate segregation in "public" schools and colleges, is expressly applicable to private schools "operated * * * predominantly from or through the use of governmental funds or property, or funds or property derived from a governmental source." *See* § 401(c), 42 U.S.C. § 2000c (1964). This is a "rule of thumb," delineating an *a fortiori* case of unconstitutional state action, which does not derogate from the standing of Negro school children to launch a challenge in case of *"any* amount of state support to help found segregated schools or to help maintain such schools". Poindexter v. Louisiana Financial Assistance Commission, 258 F.Supp. 158, 164 (3-judge court) (E.D.La.1966) (denying motion to dismiss), repeated and incorporated in Poindexter v. Louisiana Financial Assistance Comm'n, 275 F. Supp. 833, 845 (E.D.La.1967) (permanent injunction) aff'd mem. 389 U.S. 571, 88 S.Ct. 693, 19 L.Ed.2d 780 (1968). (Emphasis supplied.)

The Internal Revenue Code provisions on charitable exemptions and deductions must be construed to avoid frustrations of Federal policy. Under the conditions of today they can no longer be construed so as to provide to private schools operating on a racially discriminatory premise the support of the exemptions and deductions which Federal tax law affords to charitable organizations and their sponsors.

The construction upheld today applies to all private schools practicing racial discrimination. This goes beyond the class of schools considered in our prior opinion, 309 F.Supp. at 1132, where we discussed the constitutional problems inhering in providing tax benefits for private schools forming "a system of segregated private schools as an alternative available to white students seeking to avoid desegregated public schools." [29] The construction announced in 1970 by the IRS applies to all private schools, without reference to any finding or determination that such schools were formed for the purpose of avoiding a unitary school system. This construction comports with the Federal policy discussed above, and in our view reflects the proper construction of the Code in the light of that policy.

### C. *Avoidance of Constitutional Questions*

We are fortified in our view of the correctness of the IRS construction by the consideration that a contrary interpretation of the tax laws would raise serious constitutional questions, such as those we ventilated in our January, 1970, opinion. Clearly the Federal Government could not under the Constitution give direct financial aid to schools practicing racial discrimination. But tax exemptions and deductions certainly constitute a Federal Government benefit and support. While that support is indirect, and is in the nature

29. These findings were based on the findings of the three-judge Court in Coffey v. State Educational Finance Commission, 296 F.Supp. 1389 (S.D.Miss.1969). We found that such a system of private segregated schools would "frustrate the only constitutionally permissible state policy, of a unitary school system" because such schools are "endeavors to continue under private auspices the kind of racially segregated dual school system that the state formerly supported." 309 F.Supp. at 1137. As Judge Wisdom put it for the three-judge court in Louisiana, "The system of private segregated schools * * [presents] tangible and intangible costs to the State * * *. The facts this case presents point in only one direction: Unless this system is destroyed, it will shatter to bits the public school system of Louisiana and kill the hope that now exists for equal educational opportunities for all our citizens, white and black." Poindexter v. Louisiana Financial Assistance Commission, 275 F.Supp. 833, 856–857 (E.D.La.1967), aff'd mem. 389 U.S. 571, 88 S.Ct. 693, 19 L.Ed.2d 780 (1968).

of a matching grant rather than an unconditional grant, it would be difficult indeed to establish that such support can be provided consistently with the Constitution. The propriety of the interpretation approved by this court is underscored by the fact that it obviates the need to determine such serious constitutional claims.[30]

D. *There Is No Merit In Contentions of Intervening White Parents that This Construction Is Unconstitutional*

We must also consider the claim made by the intervenors that defendants' interpretation violates their "right under the First Amendment to the Constitution to associate in private schools of their choice without regard to the educational philosophy thereof," [31] and that, under Speiser v. Randall, 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958), "what may not be done directly cannot be done indirectly under the guise of a discriminatory interpretation of the tax laws." [32]

1. Freedom of Association

We recognize with intervenors that the Bill of Rights grants to the citizens of our free society a broad freedom of association. The liberty of a free people includes the right to educate one's child in a school of the parent's choice in public, private, or parochial. Griswold v. Connecticut, 381 U.S. 479, 482, 495, 85 S.Ct. 1678, 14 L.Ed.2d

510 (1965). These rights cannot be abridged by legislation which "unreasonably interferes with the liberty of parents and guardians to direct the upbringing and education of children under their control" or "which has no reasonable relation to some purpose within the competency of the State as is the case with legislation that requires attendance at public schools. Pierce v. Society of the Sisters, and Pierce v. Hill Military Academy, 268 U.S. 510, 534–535, 45 S.Ct. 571, 69 L.Ed. 1070 (1925).

We do not minimize the importance of the constitutional precepts established by the *Pierce* cases in 1925, and their doctrinal predecessor, Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). These decisions put a salutary end to an "effort to regiment the mental life of Americans." [33] The vitality and continuing significance of this doctrine is indisputable. Griswold v. Connecticut, *supra.* As Mr. Justice Brennan said concurring in School District of Abington Tp., Pa. v. Schempp, 374, U.S. 203, 242, 83 S.Ct. 1560, 1583, 10 L.Ed.2d 844 (1963):

Attendance at the public schools has never been compulsory; parents remain morally and constitutionally free to chose the academic environment in which they wish their children to be educated. * * * It is no proper function of the state or local govern-

---

30. *See* Dandridge v. Williams, 397 U.S. 471, 475–476, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970) ; Zschernig v. Miller, 389 U.S. 429, 444, 88 S.Ct. 664, 19 L.Ed.2d 683 (1968) (Harlan, J., concurring) ; Hamm v. Rock Hill, 379 U.S. 306, 316, 85 S.Ct. 384, 13 L.Ed.2d 300 (1964) ; Spector Motor Service v. McLaughlin, 323 U.S. 101, 105, 65 S.Ct. 152, 89 L.Ed. 101 (1944) ; Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 345–348, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring).

That the constitutional inhibitions on government grants also reach tax benefits provided by the government is evident from Griffin v. County School Board, 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964) and the references to *Griffin*

in Palmer v. Thompson, 401 U.S. ——, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1971), that the use of property tax credits for citizens contributing to the "private" schools was material as showing that the state was "directly or indirectly involved in the funding" of the segregated private academies and hence a segregated school system.

31. Intervenors' Proposed Final Judgment, ¶ 4, submitted January 15, 1971.

32. Intervenors' Points and Authorities in Opposition to Plaintiffs' Motion for Supplemental Preliminary Relief, June 26, 1970 at 12.

33. F. Frankfurter, Law and Politics (A. MacLeish and E. Prichard, Jr., eds. 1939) 195.

ment to influence or restrict that election.

█ The general right of association is protected no matter how unpopular the group's purposes or characteristics may be. Indeed, one has the constitutionally protected right to belong to political groups embracing both legal and illegal aims so long as one does not intend to engage in acts in furtherance of their unlawful purposes. Scales v. United States, 367 U.S. 203, 81 S.Ct. 1469, 6 L.Ed.2d 782 (1961), Elfbrandt v. Russell, 384 U.S. 11, 86 S.Ct. 1238, 16 L.Ed.2d 321 (1966). "For the Constitution protects expression and association without regard to the race, creed, or political or religious affiliation of the members of the group which invokes its shield, or to the truth, popularity, or social utility of the ideas and beliefs which are offered." NAACP v. Button, 371 U.S. 415, 444–445, 83 S.Ct. 328, 344, 9 L.Ed.2d 405 (1963).

Neither plaintiffs' prayers nor defendants' policy seeks to stop intervenors from sending their children to segregated private schools at their own expense, paying the full cost of education at such schools. The question posed by intervenors' contentions is whether the schools of their private choice are entitled to government support through tax exemptions and deductibility of contributions. The courts have rejected the First Amendment "right of association" claims that have been interposed as objections to court orders ordering the termination of government financial support to segregated "private" schools. This rejection is fairly implicit in the Supreme Court's decision in Griffin v. County School Board, 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964). It was made explicit in the subsequent decision on remand. See Griffin v. Bd. of Supervisors of Prince Edward County, 339 F.2d 486, 492–493 (4th Cir. 1964) (en banc). Intervenors' claims and objections must likewise be rejected.

The basic precept that undercuts the claim of intervenors is simply this: Freedom from governmental "regimenta-

tion" or interference is not to be equated with a right of support. Freedom of association in political parties is of zenith importance in our democracy, but certainly political parties and their sponsors have no constitutional entitlement to government support, whether in the form of tax exemptions or deductions or otherwise.

Intervenors seek to avoid this approach by saying, apparently, that while they have no right to individualized support they have a right to be free of discrimination through the withdrawal of benefits available on general terms. Speiser v. Randall, 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958). *Speiser* involved an affirmative requirement imposed as a condition of obtaining the tax exemptions provided for veterans by the state constitution. A statute made qualification for the exemption dependent on the filing of an oath that the applicant did not advocate the overthrow of the Government by force, violence or other lawful means. Although the statute was construed by the state court to deny exemptions only to claimants who engage in speech that may constitutionally be punished, it was enforced through procedures, placing the burdens of proof and persuasion on the taxpayers, that denied the procedural safeguards required by the due process clause, and were held to interfere with the veterans' present freedom of speech.

In the case before us exemptions and deductions would be denied not on account of beliefs and associations but on account of acts and practices constituting discrimination among students on account of race—acts contrary to a national policy that has constitutional ingredients. If schools sincerely terminate those harmful activities they may obtain the exemption. In *Speiser* the statutory scheme was offensive because it operated to chill speech that was permissible, because of fears that the veterans might be unable to establish its permissibility. It is not remotely suggested by intervenors that they fear lest their schools will undertake only

activities that are innocent, *i. e.*, not racially discriminatory, yet be wrongly condemned as discriminatory. *Speiser* certainly does not hold that a government acts impermissibly in withholding tax benefits from one who engages in activities that are reasonably and constitutionally deemed contrary to the government's policy.

In the last analysis, we observe, even statutory classifications which affect a "fundamental right" are valid when "shown to be necessary to promote a compelling governmental interest." [34] The parent cannot assert an absolute freedom to remove his child from all schooling, or to send him to a school where the curriculum includes not only mathematics but also the desirability and techniques of immediate violent overthrow of the government. All states may require that children receive some education and have some power to regulate what they are taught consistently with the public welfare. Pierce v. Society of the Sisters, *supra*, 268 U.S. at 534, 45 S.Ct. 571, Meyer v. Nebraska, *supra*, 262 U.S. at 400–402, 43 S.Ct. 625.

There is a compelling as well as a reasonable government interest in the interdiction of racial discrimination which stands on highest constitutional ground, taking into account the provisions and penumbra of the Amendments passed in the wake of the Civil War.[35] That government interest is dominant over other constitutional interests to the extent that there is complete and unavoidable conflict.[36]

Thus in Railway Mail Ass'n v. Corsi, 326 U.S. 88, 65 S.Ct. 1483, 89 L.Ed. 2072 (1945) the Court made clear that the validity of state anti-discrimination legislation, in that case a prohibition of discrimination in union membership or services on account of race, creed or color, could not be undone by a claim based on private associational freedom or liberty. The Court, per Justice Reed, stated (pp. 93–94, 65 S.Ct. p. 1487):

> A judicial determination that such legislation violated the Fourteenth Amendment would be a distortion of the policy manifested in that amendment which was adopted to prevent state legislation designed to perpetuate discrimination on the basis of race or color.

The concurring opinion of Justice Frankfurter enlarged on the dominance of preventing racial discrimination in any balancing of constitutional interests (see 326 U.S. at 98, 65 S.Ct. at 1489):

> * * * [A] State may choose to put its authority behind one of the cherished aims of American feeling by *forbidding* indulgence in racial or religious prejudice to another's hurt. To use the Fourteenth Amendment as a sword against such State power would stultify that Amendment. Certainly the insistence by individuals on their private prejudices as to race, color or creed, in relations like those now before us, ought not to have higher constitutional sanction than the determination of a State to extend the area of nondiscrimination beyond that which the Constitution itself exacts.

Similarly the compelling interest in preventing racial discrimination overrides the general freedom to dispose of one's property as one wants, see Jones v. Alfred H. Mayer Co., *supra*, a freedom that is general but not absolute.

---

34. Shapiro v. Thompson, 394 U.S. 618, 634, 89 S.Ct. 1322, 1331, 22 L.Ed.2d 600 (1969) ; Reynolds v. Sims, 377 U.S. 533, 561–562, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) ; Carrington v. Rash, 380 U.S. 89, 96, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965) ; Williams v. Rhodes, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968).

35. *See generally* Note, The "New" Thirteenth Amendment: A Preliminary Analysis, 82 Harv.L.Rev. 1294 (1969).

36. Where there is a compelling government interest even First Amendment freedoms may be limited by appropriately confined lesser measures although they could not be prohibited directly. Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960).

■ Whether such a state interest is sufficiently compelling to justify outright prohibition of racial discrimination in education by private or public schools,—as is provided in the laws of several states and in the Comprehensive Anti-Discrimination Act promulgated by the Commissioners on Uniform State Laws [37]—is a matter we are not called upon to determine in this case. That state interest is sufficient to reject the claims of Intervenors that their private support for racially discriminatory policies gives a constitutional right to government support. The private individual has no constitutional right to demand such government support.[38]

## 2. Differences From the Church Exemption Issue

Intervenors further assert that the right to tax exemption and deduction stands on the same plane for educational and religious institutions. They rely on Walz v. Tax Commission, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970). And they claim that the logic of the IRS position would compel the disallowance of the exemptions granted to private religious schools.

*Walz* upheld state tax exemptions for real property owned by churches and used for religious worship. It focused on the special constitutional features inhering in the First Amendment's provision: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." In America political union was dependent on an express toleration of religious liberty and religious differences.[39] The free exercise of religion was to be protected not only by condemning its prohibition but by avoiding government support for any involvement with religion tantamount to "establishment." *Walz* discussed the issue of "entanglement," and as the Court noted in Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971):

> "That [*Walz*] holding, however, tended to confine rather than enlarge the area of permissible state involvement with religious institutions by calling for close scrutiny of the degree of entanglement involved in the relationship."

All the opinions in *Walz* analyzed tax exemptions as providing an economic benefit,—"that exemptions do not differ from subsidies as an economic matter." (Harlan, J., 397 U.S. at 699, 90 S.Ct. at 1427). What the Chief Justice emphasized was that exemptions provide an "indirect" and "passive" support, and hence avoid the kind of excessive involvement or "entanglement" that bespeaks "establishment" of religion. It is in this context that Chief Justice Burger speaks (p. 669, 90 S.Ct. p. 1412) of the "benevolent neutrality" necessary to "permit religious exercise to exist without

37. The Model Act provides in part that it is a prohibited discriminatory practice for a public or private educational institution:

(1) to exclude, expel, limit, or otherwise discriminate against an individual seeking admission as a student or an individual enrolled as a student in the terms, conditions, and privileges of the institution, because of race, color, religion, or national origin;

Uniform Law Commissioners' Model Anti-Discrimination Act §§ 502, 501 (1966 Handbook). The Act also has specific implementing provisions, *e. g.*, prohibiting indication of any such preference or discrimination in any "catalogue or other notice or advertisement," see § 502(3).

The fair educational practices acts of nine states outlawing discrimination in both public and private schools are collected in Note, Federal Tax Benefits to Segregated Private Schools, 68 Col.L.Rev. 922, 948 n. 130 (1968).

38. Compare Shelley v. Kraemer, 334 U.S. 1, 22, 68 S.Ct. 836, 846, 92 L.Ed. 1161 (1948): "The Constitution confers upon no individual the right to demand action by the State which results in the denial of equal protection of the laws to other individuals."

39. The local churches in the American colonies exemplified not only variety but a parity of prestige—with the most prominent families likely to be Anglican in Virginia, Separatist in Plymouth, Quaker in Pennsylvania, Roman Catholic in Maryland, etc.

sponsorship and without interference," and describes tax exemption as a salutary means of preserving "the autonomy and freedom of religious bodies while avoiding any semblance of established religion."

■ Tax exemption benefit is only a "minimal and remote involvement" (p. 676, 90 S.Ct. 1409) when compared to the kind of identification and support of religion that is prohibited under the Establishment clause. But governmental and constitutional interest of avoiding racial discrimination in educational institutions embraces the interest of avoiding even the "indirect economic benefit" of a tax exemption.[40]

The special constitutional provisions ensuring freedom of religion also ensure freedom of religious schools, with policies restricted in furtherance of religious purpose. Section 503 of the Model Anti-Discrimination Act, *supra* note 37, permits religious educational institutions "to limit admission or give preference to applicants of the same religion." We are not now called upon to consider the hypothetical inquiry whether tax-exemption or tax-deduction status may be available to a religious school that practices acts of racial restriction because of the requirements of the religion. Such a problem may never arise; and if it ever does arise, it will have to be considered in the light of the particular facts and issue presented, and in light of the established rule, *see* Mormon Church v. United States, 136 U.S. 1, 10 S.Ct. 792, 34 L.Ed. 481 (1890), that the law may prohibit an individual from taking certain actions even though his religion commands or prescribes them.

\* \* \* \* \* \*

We add a final thought concerning intervenors' claims of rights under the Bill of Rights. The provisions of the Bill of Rights were added to the Constitution in order to establish the union, to gain the support of reluctant states. The prohibitions against racial discrimination rooted in the Amendments added to the Constitution following. the Civil War were the Nation's response to preserve and continue the Union.

■ The freedoms of the Bill of Rights must be read not in opposition to the safeguards of the Amendments adopted after the Civil War, but in harmony with them, toward the objective of continued national union. This is cogently demonstrated by the long line of decisions confirming that the Amendments which embody the nation's recognition of the special problems of the members of its black minority also embody assurances for them that the states will abide by the same principles of freedom and justice which those ratifying the Constitution besought as protection against the national government.

The case at bar involves a deduction given to reduce the tax burden of donors, a meaningful, though passive, matching grant, that would support a segregated school pattern if made available to racially segregated private schools.[41] We think the Government has declined to provide support for, and in all likelihood would be constitutionally prohibited from providing tax-exemption-and-deduction support for, educational institutions promoting racial segregation.

---

40. *Compare* Everson v. Board of Education, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947) *with* Griffin v. County School Board, 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 236 (1964). *Everson* upheld, as serving a valid public purpose, a state program of providing compensation to parents for the cost of busing children to their schools, even where the schools were religious. *Griffin* held unconstitutional a state subsidy to children attending segregated private schools.

41. "[T]he tax benefits under the Internal Revenue Code mean a substantial and significant support by the Government to the segregated private school pattern.
\* \* \* \* \*
"The support which is significant in the context of this controversy is not the exemption of the schools from taxes laid on their income, but rather the deductions from income tax available to the individual, and corporations, making contributions supporting the school." Green v. Kennedy, *supra*, 309 F.Supp. at 1134.

## III. NEED FOR AND NATURE OF COURT DECREE

### A. *Mootness*

 Because the Internal Revenue Service has changed its construction of the Code so as to deny tax exempt status to segregated private schools, defendants now claim that this case is moot. We disagree. In the first place there is ample doctrine that a defendant does not necessarily moot a case that is live in its inception by promising to conform to plaintiffs' wishes. United States v. W. T. Grant Co., 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953); Hecht Co. v. Bowles, 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754 (1944); *see* Consumers Union of United States, Inc. v. Veterans Administration, 436 F.2d 1363 (2d Cir. 1971). More significantly, as will appear from the subsequent discussion, there are various respects in which plaintiffs are entitled to a decree that goes beyond the 1970 declaration and approach of the Service.

### B. *Pendent Jurisdiction*

 This three-judge district court was convened because the complaint challenged the constitutionality of provisions of the Internal Revenue Code, 28 U.S.C. §§ 2282, 2284 (1964). This court also has jurisdiction, under 28 U.S.C. § 2282, sometimes called ancillary or pendent jurisdiction, to hear and determine the non-constitutional questions involved, including plaintiffs' two statutory claims, based on the Civil Rights Act of 1964 and on the proper construction of the Internal Revenue Code. Flast v. Cohen, 392 U.S. 83, 90–91, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968); Florida Lime & Avocado Growers v. Jacobsen, 362 U.S. 73, 75–85, 80 S. Ct. 568, 4 L.Ed.2d 568 (1960); United States v. Georgia Pub. Serv. Comm'n, 371 U.S. 285, 287–288, 83 S.Ct. 397, 9 L.Ed. 2d 317 (1963).

"The doctrine of dependent or ancillary jurisdiction * * * springs from the equitable doctrine that a court with jurisdiction of a case may consider therein subject matter over which it would have no independent jurisdiction whenever such matter must be considered in order to do full justice." Walmac Co. v. Isaacs, 220 F.2d 108, 113–114 (1st Cir. 1955). Pendent jurisdiction has usually been stated to exist when the two questions arise out of the same cause of action, whether they be state and federal claims, Hurn v. Ousler, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148 (1933), or two different federal claims, Romero v. International Terminal Operating Co., 358 U.S. 354, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959). The Supreme Court has recently warned that the Federal courts should not be "unnecessarily grudging" in their assumption of pendent jurisdiction. The test is that the two claims "must derive from a common nucleus of operative fact," and if "a plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding, then, assuming substantiality of the federal issues, there is *power* in Federal courts to hear the whole." United Mine Workers of America v. Gibbs, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). The ultimate disposition of the claim upon which jurisdiction is based is immaterial, so long as the claim was not plainly wanting in substance, Hurn v. Oursler, *supra.* Pendent jurisdiction of the other claims has been held to survive even when the jurisdictionally significant claim has become moot. Hazel Bishop, Inc. v. Perfemme, Inc., 314 F.2d 399 (2d Cir. 1963).

### C. *Necessity for Provisions of Decree*

While we agree with the Internal Revenue Service's present construction of the Code, the plaintiffs are entitled to more relief than the IRS contemplates.

### 1. Declaration of Meaning of Code

The July 1970 Press Release does not indicate whether the new construction is considered mandatory or merely within the sound discretion available to the IRS in construction of the Code. If defendants' construction were discretionary, it could be changed in the future. We think plaintiffs are entitled to a declaration of relief on an enduring, permanent basis, not on a basis that

could be withdrawn with a shift in the tides of administration, or changing perceptions of sound discretion.

Our decree will have no declaration of constitutional rights, but rather a declaration that the Internal Revenue Code requires a denial of tax exempt status and deductibility of contributions to private schools practicing racial discrimination.

There is another respect in which our decree provides more relief than the declarations of the Service. The Commissioner advised a committee of Congress that the new interpretation of the Code is based upon the common law of charities, and that the IRS impliedly finds that private schools which practice racial discrimination are not " 'charitable' in the common-law sense." [42] Even if the Service had not claimed complete administrative discretion to change its interpretation once again, it might have claimed the authority and even the necessity of modifying its 1970 interpretation in the light of some future changes in or reevaluation of the common law of charitable trusts. Plaintiffs are entitled to more definite and assured relief than that provided by a reading of the Code based on the evolution of state law doctrines. As we have indicated, the ultimate reason why the Code will not support tax exempt status and deductibility of contributions for such schools is based on Federal public policy. The declaratory paragraphs in our decree provide more enduring relief than the 1970 declarations of the Service, and it is relief to which plaintiffs are entitled.

2. Further Requirements

When plaintiffs began this lawsuit, they alleged that they were being deprived of substantial rights by a system of government tax benefits, i. e., an effective matching of private grants, that fostered and supported a system of segregated private schools as an alternative available to white students seeking to avoid desegregated public schools. Our ruling that plaintiffs are entitled to a decree declaring the proper interpretation of the Internal Revenue Code, which eliminates such Federal benefits and matching grants, obviates the need for a declaration of plaintiffs' constitutional rights. However, our discussion of the issues, including the intervenors' constitutional objections, makes it plain that there are strong constitutional aspects to plaintiffs' claims and that these are more prominent and substantial than a mere scenic backdrop. If the Internal Revenue Service had not adopted its July, 1970, interpretation, and if this court had acquiesced in the pre-1970 interpretation, we would in all likelihood have been required by the Constitution to enter a decree ordering the Service to cease violating plaintiffs' constitutional rights. Likewise, if the Service had merely given nominal recognition to plaintiffs' claims but had actually applied the Code so as to ignore or disregard plaintiffs' right to be free of this governmental support for racially discriminatory private schools and for circumvention of the desegregation decree, we would have had little hesitancy in saying that whether or not the statutory provision was unconstitutional on its face, it was unconstitutional as applied, and we would have provided a decree necessary for plaintiffs' protection.

In the context of this case we cannot limit the protection of plaintiffs' rights to a mere declaration of the proper construction of the Internal Revenue Code. Taking into account the conditions in Mississippi which have already led to denial of plaintiffs' rights in the past, we conclude that protection to which they are entitled includes effective "directives and procedures satisfactory to this Court that the school [receiving tax exemption and deductibility] is not part of a system of private schools operated on a racially segregated basis." [43]

42. Thrower statement, *supra*, note 3.

43. Supplemental Order of June 26, 1970; motion to set aside denied September 14,

The Federal courts have power to correct improper or inadequate action of Federal officials not only, as in the case of State officials, for failure to observe constitutional limits, but also for failure to act in consonance with pertinent Federal legislation.[44] Where necessary the courts have power even to command affirmative action. The remedial authority of the courts does not put the judges in the shoes of the officials involved. "Judicial authority enters only when local authority defaults." Swann v. Charlotte-Mecklenburg Board of Education, *supra*, 402 U.S. at 16, 91 S.Ct. at 1276, 28 L.Ed.2d 554.

The principle may be illustrated by supposing that the Service had merely voiced a unilateral declaration that it was changing its policy without any enforcement or followup whatever. In that case, it could hardly be said that this was not in substance a government support for racially discriminatory private schools virtually equivalent to that prevailing before the Service's empty declaration. This court would have authority to avoid or remedy such support by default, as contrary to the Federal legislation, and probably contrary to the Federal Constitution.

In its July 10, 1970, Press Release, the Service announced that it would give favorable rulings only to private schools that have "racially nondiscriminatory admissions policies." The Service "antici-

pated that in most instances evidence of a nondiscriminatory policy can be supplied by reference to published statements of policy or to the racial constituency of the student body." The original press releases of July 10 and July 19 did not define what was meant by a nondiscriminatory admissions policy and said nothing specific about scholarships and activities. If this had been left unchanged, an IRS approach of providing deductions and exemptions for schools certifying their nondiscriminatory admissions policy may well have embraced support for schools which reported a nondiscriminatory policy as to admissions though they were discriminating against Negro students in terms of scholarships. On such a showing the plaintiffs would plainly have been entitled to relief. Fortunately, the example is hypothetical. When the court voiced its concern at an oral argument on a procedural motion, counsel for IRS made plain that the intent of IRS was to include scholarships and activities in the standard of nondiscriminatory admissions policy, and the amplifying and clarifying definition subsequently set forth by the Service, which we approve, obviates the particular concern.[45] But the example serves to illustrate the sound authority of the court to provide relief needed to safeguard the underlying interests of plaintiffs which defendants had been ignoring and threatening and which this lawsuit was brought to protect.

---

1970. It is no longer decisive whether the system is operated as an alternative to white students seeking to avoid desegregated public schools.

44. Leedom v. Kyne, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958) ; Administrative Procedure Act, 5 U.S.C. §§ 551 et seq., 701 et seq., 3105 (Supp. V, 1970), *cf.* Oestereich v. Selective Service System Local Board, 393 U.S. 233, 89 S.Ct. 414, 21 L.Ed.2d 402 (1968).

45. See Manual Supplement (II) 6G–58, issued December 21, 1970, § 2.04 :

The term "nondiscriminatory admissions policy," as used here, means the admission of all students to all the rights and privileges generally accorded students at that school. This would

contemplate, for example, nondiscriminatory administration by the school of scholarship programs, athletic programs, extra-curricular activities that are a part of the school's regular program, and similar activities. In practice, this would mean that a charitable school would not maintain separate classes, separate buildings, or separated sections in the cafeteria along racial lines.

The Manual Supplement has been described by the Commissioner as "an in-house directive to the field." Thrower testimony, *supra* note 3, at 2016.

A similar construction appears in the deposition of Commissioner Thrower on August 14, 1970, given prior to our inquiry at oral argument.

The Internal Revenue Service has taken a number of important steps in implementing its announcement of the proper construction of the Code. As of December 10, 1970, the Service sent letters to approximately 5,000 private schools across the country which had previously received favorable rulings of tax exemption, asking each school to state whether or not its admissions policies are discriminatory.[46] Similar information is being sought from some 10,000 schools covered by group rulings.[47]

This court was originally concerned with 41 Mississippi private schools that had received advance assurances of deductibility. The Service, after giving notice, suspended such advance assurances for 30 schools, and later sent letters of revocation of rulings recognizing tax exemption to twenty-one schools. The Service found that two schools had ceased operations. The nine remaining schools are covered by favorable rulings left intact.[48]

What the Service has already done serves to provide relief to the plaintiffs in regard to at least one important initial objective: there is no longer a continuance of Federal Government rulings providing psychological support for self-declared segregated white academies.

The Service's procedure with respect to the Mississippi schools has been the same as its procedure for all other private schools in the country. The IRS asks each school whether or not it discriminates. It relies on the good faith of the answer, pending future investigation and audit. In keeping with its philosophy of a "self-assessment" tax system, the Government has stated that it will presuppose good faith on the part of all applicants, and the Service states that it must rely on the written statements of applicant taxpayers for issuing a tax exemption ruling.

"There is no provision in the detailed Internal Revenue procedures for auditing and carrying out a field investigation of an applicant as a condition for issuing a ruling recognizing tax exemption or assuring deductibility. The procedure used for issuing almost all such rulings entails only evaluation of the applicant's written representations and supporting documentation * * *" Memorandum in Opposition to Plaintiffs' Proposed Injunctive Decree, Jan. 25, 1971, at 9. See also Rev.Proc. 69–1, 1969–1 Cum.Bull. 381.

3. Injunction Conditioning Advance Assurance of Deductibility for Mississippi Schools on Compliance with Prescribed Procedures

This court concludes that the applicable principles require a further decree enjoining advance assurance of deductibility and recognition of tax-exempt status to private schools in Mississippi unless certain procedures are complied with.

The history of state-established segregation in Mississippi, coupled with the founding of new private schools there at times reasonably proximate to public school desegregation litigation, leaves private schools in Mississippi carrying a badge of doubt. The finding in the *Coffey* case, *supra*, which has not been controverted and which we accept, that the new schools were established as segregated schools leads us to declare that it is the duty of the Internal Revenue Service to seek out supplementary information, whether or not required for schools elsewhere, before granting final rulings of tax-exempt status and deductibility of contributions to those private Mississippi schools applying for such benefits. The same condition of reasonable proximity to desegregation litigation applies not only to schools organized in contemplation of litigation about to

---

46. Defendants' Memorandum in Opposition to Plaintiffs' Proposed Injunctive Decree, Jan. 25, 1971, Appendix B.

47. Affidavit of Randolph W. Thrower, Commissioner of Internal Revenue, De-

cember 10, 1970, ¶ 6. A group ruling is one given to an umbrella organization.

48. Affidavit of Randolph W. Thrower, October 14, 1970, ¶¶ 1, 5.

start, but also to schools subsequently organized in the wake of a decree.

To obviate any possible confusion the court is not to be misunderstood as laying down a special rule for schools located in Mississippi. The underlying principle is broader, and is applicable to schools outside Mississippi with the same or similar badge of doubt. Our decree is limited to schools in Mississippi because this is an action in behalf of black children and parents in Mississippi, and confinement of this aspect of our relief to schools in Mississippi applying for tax benefits defines a remedy proportionate to the injury threatened to plaintiffs and their class.

In this action, our order of June 26, 1970, required defendants to suspend the advance assurance of deductibility contributions for segregated private schools in Mississippi which were either cited in the *Coffey* litigation or were the subject of applications forwarded to the National Office for processing. Our order required this suspension to continue pending final decree unless defendants "first affirmatively determine pursuant to appropriate directives and procedures satisfactory to this Court that the school whose advance assurance of deductibility is suspended is not part of a system of private schools operated on a racially segregated basis as an alternative to white students seeking to avoid desegregated public schools."

As to the nine private schools in Mississippi for whom the Commissioner retained exemptions, in effect the Commissioner submits to the court that his action is in accordance with our June, 1970 Order. Plaintiffs contend that his approval, and the underlying procedures, are inconsistent with our June, 1970 Order, and seek an order of this court requiring the Commissioner to suspend the advance assurances of deductibility unless and until the Commissioner has concluded a wide array of detailed investigations.

While we think that various procedures and requirements proposed by plaintiffs

are not appropriate for inclusion in our final decree, we have identified two areas that we conclude, on reflection, are appropriate for our final decree as a condition for advance assurances for Mississippi private schools in view of the "badge of doubt" context already discussed.

a. *Communication of Policy to Community*

The IRS Press Release of July 10 announces that "in most instances evidence of a nondiscriminatory policy can be supplied by reference to published statements of policy" or by showing the racial make-up of the student body.

There was no requirement by the IRS concerning these policy statements, either as to frequency of publication, or form, or even, and significantly, whether the publication was in a newspaper or over a radio station likely to be read by or listened to by the Negro community.

We now turn to what is in the record concerning the nine Mississippi schools which the Commissioner found were in such compliance that he felt free under our June 1970 Order to decline to suspend exemption. (Thrower Affidavit, *supra* note 48, Ex. 1–10).

The statement of policy of North Delta Schools, captioned "Legal Notice," was published in a single issue of a local newspaper, appearing in the Legal Notices section alongside a substituted trustee's notice of sale. The Noxubee Academy's five-line small-type "Notice" was also inserted only once. Deer Creek Day School of Arcola made three spot announcements over a radio station. Plaintiffs' affidavits, filed Nov. 16, 1970, say this is a station to which few blacks apparently listen. (Affidavit of Jake B. Ayers.) Copiah Academy purchased one small advertisement run on page four of the local newspaper which stated that "Application can be made during business hours on a racially non-discriminatory basis * * *." It was not even explicitly stated that applications would

be evaluated on a non-discriminatory basis.

In other cases the Service has been satisfied with an oblique reference to racially nondiscriminatory policy which had no separate heading whatever, but merely was included in the course of a single appearance of a long newspaper story on another subject—headlined, in the case of County Day School of Marks, "Foundation Gets $2,000 Tuition Grant," [49] and in the case of Indianola Academy, "Academy Expands Facilities." [50]

We are aware that in addition to the reference in the News Releases there is a paragraph in the Service Manual on this subject which is sound so far as it goes.[51] But in a matter as fundamental as notice to the affected community of the racially nondiscriminatory admissions policy we think plaintiffs' interests are too critical to permit substantial impairment in fact out of a concern for any particular technique of Service procedures.

In objecting to plaintiffs' requests counsel for the Commissioner have emphasized the need for maintaining the principle of self-assessment underlying the administration of the United States income tax. That is, indeed, an important ingredient of American tax policy, combined of course with meaningful auditing procedures for significant returns (and random auditing for returns of lesser consequence), and meaningful sanctions for deterrence. Conjoined with the principle of self-assessment, however, are a statute and regulations as detailed as any in American law libraries. That is as it should be, for we cannot rightly expect a taxpayer to make all meaningful disclosures and reports unless he is clearly advised of the applicable requirements. As the Government pointed out in its Memorandum, *supra* note 46, p. 9, " * * * since only a very small minority of all returns filed can be audited, this self-assessment system requires that taxpayers not only be honest, but also well-informed." We do not undercut, we rather underline, the principle of self-assessment by schools when we require the Service to tell them in advance and with more detail the kind of showing as to publication of nondiscriminatory admission policies that will be requisite.

Our concern with the reference to "nondiscriminatory admissions policy"

49. The pertinent foundation is identified as one organized by residents who became concerned over the deterioration of quality of education in the public schools, and the period of uncertainty, due to legal actions involving desegregation policies, in which qualified teachers resigned from the county schools. In the course of a two-column story there appears a single paragraph stating that concerned parents "interested in providing the highest possible quality education under a racially nondiscriminatory policy" affiliated with the local Foundation, and that the Foundation "has operated under this policy and has had quality education as its primary objective since its inception."

50. The reference to "no racially discriminatory admissions policy" takes up one-quarter inch (2 lines) of a nine-inch story.

51. Manual Supplement (11) 6G–58, issued December 21, 1970, Sections 3.03 and 3.04 provides:
.03 To establish that it has a nondiscriminatory policy, a school must provide by charter, bylaws, or resolution of the governing body that it will not discriminate against applicants on the basis of race.
.04 To establish that it is operated on a nondiscriminatory basis a school's exemption application must show that it has adequately publicized in a manner calculated to make known to all segments of the community the fact that it does not discriminate on the basis of race. Such a policy is adequately publicized if it is generally known to all segments of the community served by the institution. For example, a private school whose student body is drawn from a particular locality may satisfy this requirement by publishing a notice to this effect in a prominent space in a local paper of general circulation. Statements of nondiscriminatory policy in brochures and catalogues alone will not normally be considered adequate publicization to all segments of the community unless there is a clear showing that these documents are in fact distributed to all segments of the community.

in the News Release of July 10, 1970, has not been wholly abated by the IRS amplification in the Commissioner's deposition of August 14, 1970, and in the December addition to the IRS Manual, which is an "in-house directive to the field." (See note 45). It is by no means clear whether the scope of the necessary non-discriminatory policy is understood by the schools. It is for that reason that our decree uses as its summarizing reference the requirement of a "racially non-discriminatory policy as to students," and makes it clear that a school in Mississippi, the particular subject of our decree, must make a showing that it has adopted and publicized a racially non-discriminatory policy as to students, and specifically that it does not discriminate on the basis of race in administration of educational policies, applications for admission, and in regard to scholarship and loan programs, and athletic and extra-curricular programs.

The foregoing sets forth our reasons for including in our decree provisions as to notification of nondiscriminatory policy by schools in Mississippi. The Service would be within its authority in including similar requirements for all schools of the nation. For reasons already explained, our action making this an affirmative requirement as a condition of advance assurance is limited to schools in Mississippi because of the nature of this class action.

b. *Further Information Required From Mississippi Schools*

Our order requires that private educational institutions in Mississippi seeking the tax benefits involved in this case submit information of a type subject to objective evaluation, that we think requisite, for areas with a badge

of doubt, to avoid a default that would present the problem of a statute being given an application denying fundamental rights.

This necessary information to be submitted includes a racial breakdown of students attending and applying, the disposition of available scholarship and loan funds, and a racial breakdown of faculty and administrative staff.[52] It also includes the listing of incorporators, founders, board members; listing of donors of land or buildings, whether individual or corporate; and a statement as to whether any of the foregoing have an announced identification as officers or active members of an organization having as a primary objective the maintenance of segregated school education.

Our requirements do not establish substantive criteria but are information requirements, to assure that the Service will have salient information at hand before it makes a certification or gives an assurance of exemption or deductibility. Our information requirements do not exhaust the enforcement function of the Service. The Service continues to have the function to conduct follow-up investigations, and audits, to insure good faith compliance. We rely on the statements of the Service concerning their program[53] as a good faith representation that will be honored without the necessity for inclusion in a mandate.

▬▬▬▬ We revert to the Commissioner's contention that in view of our acceptance of his interpretation of the statute, our decree should not extend to any matters of administration, such as information requirements. We think such a contention, and such a course if accepted by us, would run counter to the principle applied in Atlantic Refining

---

52. So far as minority representation on the faculty or administrative staff is concerned, this is obviously a meaningful indicator that the school does not have a discriminatory policy as to students, whether as to educational policies, admissions, scholarship and loan programs, or other activities.

53. Thus the Commissioner's affidavit of October 14, 1970, ¶ 11, has given assurance to this court that the Service will conduct an audit examination within 18 months of that date with respect to the operations of each of the nine Mississippi schools retaining assurances of deductibility to assure their compliance.

Co. v. Public Service Commission, 360 U.S. 378, 389 ff., 79 S.Ct. 1246, 3 L.Ed. 2d 1312 (1959) that the public interest requires a court to assure adequate consideration of initial applications to the Government when that is a crucial step not readily correctible at a later stage on consideration of the permanent application. That is a fair description of the matter before us, since an improvident ruling recognized tax-exempt status and advance assurance of deductibility would guarantee the deductibility of contributions later made even though a subsequent audit resulted in revocation (prospectively) of the exemption ruling.

The *Atlantic Refining* case also highlights the importance of withholding an approval when the available information "signals the existence of a situation that probably would not be in the public interest." 360 U.S. at 391, 79 S.Ct. at 1255. That is the approach we have followed: to assure an inquiry in the first instance that is responsible and appropriate though not a detailed audit, —and thus to lay a basis for a withholding of approval where there are danger signals until further inquiry can be had.

Our Order provides for a reasonable time in which those schools whose rulings recognizing advance assurances of deductibility and exempt status have not been suspended can comply with the publication and information requirements.

### 4. Principles Applicable To Decree

Having indicated the need for some detailed requirements in the decree, in addition to the declaration of the meaning of the statute, we think it appropriate to enlarge on the applicable principles that lead the court to include these requirements.

If this case had been focused solely on the constitutionality of the Code, the court would clearly have been empowered to render a meaningful decree for the protection of threatened rights, with whatever detail is appropriate for that purpose. *E. g.*, Swann v. Charlotte-Mecklenburg Board of Education, *supra*. Is there any limitation on the court because, as we have held, the statute itself establishes the plaintiffs' rights? The answer is in the negative. In the first place, as we shall presently demonstrate, there is established doctrine that even when the claim before the court is based on statute the equity court has jurisdiction to go beyond the remedies set forth in the statute in order to grant full relief to those in the class protected by Congress. This doctrine has a broad range in a case like that at bar, of fundamental statutory rights infused with constitutional ingredients. We have no hesitation in ascertaining that plaintiffs' statutory rights are of such constitutional caliber even though technically we have not had to enter a full ruling on the merits of their initial constitutional claim. In this context the court is required to exercise its undoubted function as a court of equity to give full and effective relief.

The court acquired a responsibility with this lawsuit to protect plaintiffs from vitiation of their right to be free of the consequences of Government support of racially discriminatory schools, private or public. The court was charged and remains concerned with avoiding vitiation of that right by either a construction or an application that undermines the protection of the rights safeguarded by the Code as properly construed.

The established equity doctrine to which we have alluded rests on this fundamental concept: "A court of equity ought to do justice completely, and not by halves." Camp v. Boyd, 229 U.S. 530, 551, 33 S.Ct. 785, 793, 57 L.Ed. 1317 (1913). In Bell v. Hood, 327 U.S. 678, 684, 66 S.Ct. 773, 777, 90 L.Ed. 939 (1946), the Court recognized that this principle has particular vigor "where federally protected rights have been invaded," and in such cases "courts will be alert to adjust their remedies so as to grant the necessary relief." The on-

going jurisprudence of the Supreme Court provides a number of applications of this principle to Federal rights established by Congressional enactment. Thus under a statute expressly providing for suits to enjoin collection of over-ceiling rents, the Court entered an order requiring restitution of past excess rents although this relief was not set forth in the statute. See Porter v. Warner Holding Co., 328 U.S. 395, 398, 66 S.Ct. 1086, 1089, 90 L.Ed. 1332 (1946):

> "Unless otherwise provided by statute, all the inherent equitable powers of the District Court are available for the proper and complete exercise of that jurisdiction. And since the public interest is involved in a proceeding of this nature, those equitable powers assume an even broader and more flexible character than when only a private controversy is at stake. Virginian R. Co. v. System Federation, 300 U.S. 515, 552 [57 S.Ct. 592, 601, 81 L.Ed. 789]. Power is thereby resident in the District Court, in exercising this jurisdiction, 'to do equity and to mold each decree to the necessities of the particular case.' Hecht Co. v. Bowles, 321 U.S. 321, 329 [64 S.Ct. 587, 592, 88 L.Ed. 754] * * * [T]he court may go beyond the matters immediately underlying its equitable jurisdiction and decide whatever other issues and give whatever other relief may be necessary under the circumstances. Only in that way can equity do complete rather than truncated justice."

Again in Mitchell v. Robert De Mario Jewelry, Inc., 361 U.S. 288, 292, 80 S.Ct. 332, 335, 4 L.Ed.2d 323 (1960), where the statute conferred jurisdiction to restrain violations of the Fair Labor Standards Act, the Court went on to order reimbursement for loss of wages caused by an unlawful discharge or other discrimination. The Court referred to "the historic power of equity to provide complete relief in light of the statutory purposes." The same principle was applied to a securities regulation statute in J. I. Case Co. v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964).

The principle is applicable with full vigor when the statute relates to fundamental civil rights. Thus the Voting Rights Act of 1965 made provision only for suits by the Attorney General for a declaratory judgment that a State has failed to comply with the Act. The Court held in Allen v. State Board of Elections, 393 U.S. 544, 557, 89 S.Ct. 817, 827, 22 L.Ed.2d 1 (1969) that "[i]t is consistent with the broad purpose of the Act to allow the individual citizen standing" to bring such an action to assure State and local compliance with the Federal requirement. Significantly in Jones v. Alfred H. Mayer Co., *supra*, 392 U.S. at 414, 88 S.Ct. at 2190, 20 L.Ed.2d 1189, the Court observed that although the Civil Rights Act of 1866 (42 U.S.C. § 1982) "provides no explicit method of enforcement" the Federal courts were not prevented "from fashioning an effective equitable remedy."

This principle must be applied with reasonable regard for the scope of the administrative discretion that properly belongs to the Commissioner and the Service. We do not purport to gainsay the importance of self-discipline as a general guiding principle in our self-assessment system of taxation. We limit the decree to what we think appropriate in an action against the Internal Revenue Service, without the degree of detail and specificity that might be appropriate in an action against, say, public school board officials charged with failure to provide the desegregation required by the Constitution. But these principles of restraint have themselves been put in perspective, and we may not shrink from the historic responsibility of the equity court. In this case that leads to our decree's providing more effective relief than a mere declaration of statutory construction.

This opinion constitutes our findings of fact and conclusions of law in support of our Order.

ORDER FOR DECLARATORY RELIEF AND PERMANENT INJUNCTION

Upon consideration of the motions, oppositions, pleadings, affidavits, exhibits, admissions and depositions of the parties, and after hearing argument, this court for the reasons set forth in the opinion filed herewith hereby enters the following order:

It is this 30th day of June, 1971,

I. *Declaratory Relief*

Declared that:

A. Section 501(c) (3) of the Internal Revenue Code of 1954 does not provide a tax exemption for, and Section 170(a)–(c) of the Code, does not provide a deduction for a contribution to, any organization that is operated for educational purposes unless the school or other educational institution involved has a racially nondiscriminatory policy as to students.

B. As used in this Order, the term "racially nondiscriminatory policy as to students" means that the school or other educational institution admits the students of any race to all the rights, privileges, programs and activities generally accorded or madé available to students at that school, and which includes, specifically but not exclusively, a policy of making no discrimination on the basis of race in administration of educational policies, applications for admission, of scholarship and loan programs, and athletic and extra-curricular programs.

II. *Permanent Injunction*

Ordered, Adjudged, and Decreed that defendants John B. Connally, as Secretary of the Treasury, and Randolf W. Thrower as Commissioner of Internal Revenue, their agents, servants, employees, and attorneys are enjoined and restrained as follows:

(A) From approving any application for tax exempt status under Section 501 (c) (3) of the Internal Revenue Code of 1954 for any private school located in the State of Mississippi unless such private school makes a showing in support of its exemption application—

(1) That the school has publicized the fact that it has a racially nondiscriminatory policy as to students, meaning that it admits the students of any race to all the rights, privileges, programs and activities generally accorded or made available to students at that school, and further meaning, specifically but not exclusively, a policy of making no discrimination on the basis of race in administration of educational policies, applications for admission, of scholarship and loan programs, and athletic and extra-curricular programs.

(2) That the school has publicized this policy in a manner that is intended and reasonably effective to bring it to the attention of persons of student age (and their families) who are of minority groups, including all nonwhites. Specifically but not exclusively the school must—

(a) if it chooses to publicize this policy in printed notices, caption such notices in such a way as to call attention to the notice, for example bold face heading, and to call attention to its nature as a notice of racially nondiscriminatory policy as to students;

(b) provide reference to its nondiscriminatory policy in its brochures and catalogues and also in any printed advertising which it uses as a means of informing applicants of its programs;

(c) comply with such further requirements as to contents, prominence, and form of publicizing of policy, and as to frequency of reiteration, as the Internal Revenue Service may provide;

(d) certify that it has made no statements, and taken no actions, qualifying or negating its published statements of nondiscriminatory policy as to students.

(B) From approving any application for tax exempt status under Section 501 (c) (3) of the Internal Revenue Code of 1954, for any private school located in the State of Mississippi unless such private school has supplied the Internal Revenue Service with the information

set forth below, which the court finds material in order for the Service to be in an effective position to determine whether the school has actually established a policy of nondiscrimination, as follows:

(1) Racial composition, as of the pending academic year, and projected so far as may be feasible for the subsequent academic year, of—

(a) Student body,

(b) Applicants for admission,

(c) Faculty and administrative staff.

(2) Amount of scholarship and loan funds, if any, awarded to students enrolled or seeking admission, and racial composition of students who have received such awards.

(3) (a) Listing of (i) incorporators, founders, and board members; (ii) donors of land or buildings, whether individuals or organizations, and (b) a statement as to whether any of the foregoing have an announced identification as an organization having as a primary objective the maintenance of segregated school education, or have an announced identification as officers of or active members of such an organization.

(C) From continuing in effect any ruling recognizing tax exempt status of a private school in Mississippi, unless the showing and information set forth in (A) and (B) shall be made or supplied within 90 days from the date of issuance of this Order, or such additional period, not to exceed 90 days, as defendants may provide on cause shown in order for the school to make the showing or supply the information required hereunder.

(D) From approving under Section 170(a) through (c) of the Internal Revenue Code of 1954 the deductibility of any contribution made since June 26, 1970, to a private school in Mississippi if at the time of such contribution the school would not have been entitled, consistent with the terms of this Order, to approval or maintenance of tax exempt status.

III. All prayers of Plaintiffs not herein granted, and all prayers of Intervenors, are hereby denied.