ESTATE OF FRANCES FOSTER WELLS, DECEASED, EUGENE P. RUEHLMANN, EXECUTOR, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5691–66. Filed September 16, 1968.

*Michael D. Rose,* for the petitioner.
*Conley G. Wilkerson,* for the respondent.

OPINION

TIETJENS, *Judge:* The Commissioner determined a deficiency in estate tax in the amount of $2,328.25.

The only issue is whether the Commissioner properly valued for estate tax purposes the shares of certain open-end investment com-

panies. He valued them pursuant to section 20.2031–8(b),[1] Estate Tax Regs., the validity of which is in contention.

All of the facts are stipulated and so far as pertinent are as follows:

The petitioner is Estate of Frances Foster Wells, deceased, Eugene P. Ruehlmann, executor. Eugene P. Ruehlmann's business address at the time this petition was filed was and now is 1800 First National Bank Building, Cincinnati, Ohio.

Frances Foster Wells died testate January 27, 1964, a resident of Cincinnati, Ohio. The Federal estate tax return of Frances Foster Wells was timely filed with the district director of internal revenue, Cincinnati, Ohio, on April 27, 1965.

At the date of her death, January 27, 1964, Frances Foster Wells owned shares in open-end investment companies or mutual funds as follows:

| | Number of shares |
|---|---|
| Massachusetts Investors Trust | 1,073 |
| Geo. Putnam Fund of Boston | 3,876.638 |
| Wellington Fund, Inc | 1,031.601 |

A mutual fund or open-end investment company is an organization which sells shares in itself and with the proceeds therefrom invests in securities of other firms. A mutual fund or open-end investment company issues as many of its shares as can be marketed and continually offers its shares to the public. Also a mutual fund or open-end investment company continually offers to redeem its outstanding shares from the holders thereof. The open-end investment companies or mutual funds whose shares were included in the taxable estate of Frances Foster Wells sell their shares to the public through management companies and/or "underwriters" acting as agents for and pursuant to contracts with the open-end investment companies or mutual funds.

Customarily, the price at which open-end investment companies or mutual funds offer their shares to the public (quoted in financial publications as the "asked" price) is the net asset value which is the fractional value per share outstanding of the fund's net assets, plus a "sales load" or "sales charge." The "sales load" or "sales charge"

---

[1] Sec. 20.2031–8 Valuation of certain life insurance and annuity contracts; valuation of shares in an open-end investment company.

(a) *Valuation of certain life insurance and annuity contracts.* (1) The value of a contract for the payment of an annuity, or an insurance policy on the life of a person other than the decedent, issued by a company regularly engaged in the selling of contracts of that character is established through the sale by that company of comparable contracts. * * *

\* \* \* \* \* \* \*

(b) *Valuation of shares in an open-end investment company.* (1) The fair market value of a share in an open-end investment company (commonly known as a "mutual fund") is the public offering price of a share, adjusted for any reduction in price available to the public in acquiring the number of shares being valued. * * *

goes entirely to the management companies and/or "underwriters" for their services in marketing the shares. The sales load represents a percentage of the offering price and varies between a maximum and minimum charge depending on the quantity purchased in a single transaction. The sales load with respect to each of the funds herein involved as of January 27, 1964, was as follows:

| | Maximum (percent) | Minimum (percent) |
|---|---|---|
| Massachusetts Investors Trust | 8. 5 | 1. 75 |
| Geo. Putnam Fund of Boston | 8. 5 | 1. 0 |
| Wellington Fund, Inc | 8. 0 | 2. 25 |

There are in existence open-end investment funds which do not include a "load charge" in their public offering price. Both the public offering price "asked" and the public redemption price "bid" for shares in such a fund are equal to the net asset value of such shares. The Scudder, Stevens & Clark Common Stock Fund, Inc., is such a "no-load" fund.

The price at which open-end investment companies or mutual funds will redeem their shares (quoted in financial publications as the "bid" price) is the net asset value, which is the fractional value per share outstanding of the funds' net assets.

The bid and asked prices for open-end investment companies or mutual fund shares represent the prices at which transactions with the open-end investment companies or mutual funds take place rather than the range of negotiations and transactions. Except for a negligible number of transfers between individuals, all transactions with respect to open-end investment companies or mutual fund shares take place with the particular open-end investment company or mutual fund whose shares are involved.

The open-end investment company or mutual fund shares involved herein were reported in the estate tax return filed by the Estate of Frances Foster Wells at the following valuation per share:

| | |
|---|---|
| Massachusetts Investors Trust | $15. 72 |
| Geo. Putnam Fund of Boston | 15. 62 |
| Wellington Fund, Inc | 14. 75 |

On the date of the death of Frances Foster Wells, January 27, 1964, Massachusetts Investors Trust, the Geo. Putnam Fund of Boston, and Wellington Fund, Inc., were offering and sold shares in their respective companies to the public (asked price) and were offering to and did redeem shares in their respective companies from the holders thereof (bid price) as follows:

| | Asked price | Bid price |
|---|---|---|
| Massachusetts Investors Trust | $17. 18 | $15. 72 |
| Geo. Putnam Fund of Boston | 17. 07 | 15. 62 |
| Wellington Fund, Inc | 16. 08 | 14. 75 |

These bid and asked prices were not subject to negotiation but represent the prices at which transactions with the above referred to open-end investment companies took place on the date indicated, rather than the range of negotiations and transactions, excepting those transactions that may have occurred whereby shares were purchased from the funds in sufficient quantities that quantity purchase discounts, representing reductions in per share purchase price, were allowed.

On the purchase and sale of listed corporate common stock by an individual through a stockbroker, the normal vehicle for such transactions, the stock is purchased or sold at an agreed figure and in addition at the same time the stockbroker normally charges the individual purchaser or seller a commission for his services in purchasing or selling the shares. Where a stockbroker is acting as an underwriter of a stock issue, the stock is offered by the broker-underwriter to the public at a fixed price including the underwriting cost. The issuing corporation receives the amount paid by the purchaser less the underwriting costs.

The applicable lump-sum public offering prices, asked prices, on January 27, 1964, for shares in each of the subject open-end investment companies include the maximum sales load with respect to a share in each company. A quantity purchase discount would have been available to a purchaser on January 27, 1964, had he purchased on that date in a single transaction with each respective mutual fund the number of shares which the decedent owned on January 27, 1964, in Massachusetts Investors Trust and the Geo. Putnam Fund of Boston. No quantity purchase discount would have been available on January 27, 1964, with respect to a purchase in one transaction of the number of shares which the decedent owned on January 27, 1964, in the Wellington Fund, Inc. Taking into consideration the applicable quantity purchase discounts that would have been available in acquiring the number of open-end investment company shares owned by Frances Foster Wells on the date of her death, January 27, 1964, the asked prices as adjusted for the quantity discounts would be as follows:

| | |
|---|---|
| Massachusetts Investors Trust | $16.99 |
| Geo. Putnam Fund of Boston | 16.30 |
| Wellington Fund, Inc. | 16.08 |

Therefore, under section 20.2031–8(b), Estate Tax Regs., the fair market value of the shares of open-end investment company stock owned by Frances Foster Wells on the date of her death, January 27, 1964, is no greater than the amounts shown below:

|  | Number of shares | Per-share value | Total valuation |
|---|---|---|---|
| Massachusetts Investors Trust_____ | 1, 073 | $16. 99 | $18, 230. 27 |
| Geo. Putnam Fund of Boston_____ | 3, 876. 638 | 16. 30 | 63, 189. 20 |
| Wellington Fund, Inc_____ | 1, 031. 601 | 16. 08 | 16, 588. 14 |

These are the the valuations finally agreed to by the Commissioner in accord with the regulations.

Simply, the question is whether the Commissioner properly valued, for estate tax purposes, the shares of the open-end investment companies owned by the estate. In accordance with section 20.2031–8(b), *supra*, the value was determined to be the public offering price per share (now by agreement adjusted to the "price available to the public in acquiring the number of shares being valued," as provided in the regulations), in the event we decide for the Commissioner.

Both parties have submitted enlightening briefs. We are persuaded that the Commissioner's determination should be sustained and we follow his reasoning.

Section 2031(a), I.R.C. 1954,[2] provides that:

The value of the gross estate of the decedent shall be determined by including to the extent provided for in this part, the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated.

Pursuant to the general authority to prescribe regulations found in section 7805(a), section 20.2031–8(b), set out in footnote 1, was promulgated in 1963. No contention is made by the petitioner that this section of the regulations was not followed. The validity of the regulation itself is attacked.

It has often been held that Treasury regulations are to be sustained unless they are found to be unreasonable and plainly inconsistent with the revenue statutes. *Commissioner* v. *South Texas Lumber Co.*, 333 U.S. 496 (1948). We think the regulation is reasonable.[3]

In formulating the regulations relating to valuation, open-end investment company shares were included by the Treasury in section 20.2031–8 along with "certain life insurance and annuity contracts," rather than in section 20.2031–2,[4] "Valuation of stocks and bonds," which set the value of the latter at the "mean between the highest and

---

[2] All Code references will be to the Internal Revenue Code of 1954 unless otherwise noted.

[3] *Sometimes* we are persuaded to hold a regulation to be unreasonable and so invalid. *Estate of Lawrence R. McCoy,* 50 T.C. 562 (1968).

[4] Sec. 20.2031–2  Valuation of stocks and bonds.

(a) *In general.*  The value of stocks and bonds is the fair market value per share or bond on the applicable valuation date.

(b) *Based on selling prices.*  If there is a market for stocks or bonds, on a stock exchange, in an over-the-counter market, or otherwise, the mean between the highest and lowest quoted selling prices on the valuation date is the fair market value per share or bond. * * *

lowest quoted selling prices." Petitioner argues that this is a significant inconsistency which makes the regulation with which we are concerned of doubtful validity.

We think this organization of the regulations was no more than recognition that investment company shares are a different breed of cats from ordinary stocks and bonds; and when it comes to valuing them, a different criterion can reasonably be applied, more nearly like that applied to life insurance and annuity contracts than stocks and bonds.

Of course it can be argued, and with reason, that distinctions between these categories of investments are tenuous; but even petitioner recognizes "there are technical distinctions between mutual funds and other equity securities such as common stocks." He argues such "distinctions are negligible for purposes of valuation." The Treasury evidently thought otherwise. Petitioner points out with reference to stocks and bonds, that the mean between the highest and lowest quotation is used "because the quotations represent the range of prices, as opposed to indicating fixed prices as is the case with mutual funds." To us, this reasonably could be a factor justifying different valuation criteria.

As argued by the Commissioner:

the only transactions with the public involving the purchase of open-end investment company shares and thus true market place willing buyer—willing seller transactions are the transactions whereby members of the public purchase the shares at the public offering prices. Therefore, Regs. 20.2031–8(b), consistent with the valuation concept in Regs. 20.2031–2(b), provides that the fixed prices at which these transactions occur is taken as the measure of fair market value. Obviously, the transactions whereby the open-end investment companies redeem their shares from the holders are distinguishable from the sales by members of the public to other members of the public in the case of common stocks. Thus a considerable difference exists with respect to the disposition of an open-end investment company share by a member of the public, as this is not a true willing buyer—willing seller transaction.

It is simply a set redemption price. This difference is appropriately recognized in section 20.2031–8(b).

In addition, the use of the "asked" price is supportable by the cases of *Guggenheim* v. *Rasquin*, 312 U.S. 254 (1941), and *Estate of Frank Miller Gould*, 14 T.C. 414 (1950). In *Guggenheim*, the issue concerned the method for valuing a life insurance policy—should the value be the amount for which the policy could be surrendered, or what it would cost to purchase it. The Court said:

Surrender of a policy represents only one of the rights of the insured or beneficiary. Plainly that right is one of the substantial legal incidents of ownership. * * * But the owner of a fully paid life insurance policy has more than the mere right to surrender it; he has the right to retain it for its investment virtues and

to receive the face amount of the policy upon the insured's death. \* \* \* All of the economic benefits of a policy must be taken into consideration in determining its value for gift-tax purposes. To single out one and to disregard the others is in effect to substitute a different property interest for the one which was the subject of the gift. \* \* \* [312 U.S. at 257.]

Likewise, in *Gould*, this Court held that the value of a ring included the tax paid on its purchase.

Both *Guggenheim* and *Gould* involved the determination of value for gift tax purposes. Both cases held that the gift was to be valued by reference to the replacement cost. The donee acquired the ownership of the property including all the uses and privileges of an owner, and accordingly, the gift should be valued at what it would have cost the donee to purchase all those benefits.

If the proper test for valuing a gift is the replacement cost, the same measure of value may appropriately be applied to an estate since it involves testamentary gifts. The estate and the beneficiaries may continue to own the mutual fund shares, and if they do, they would enjoy all the benefits of ownership of the stock, including not only the right to redeem, but also the right to continue to hold the stock and to receive its dividends. In such case, it would be appropriate to tax them on the replacement cost. Moreover, if they do dispose of the shares, no hardship is imposed upon them. Under section 20.2053–3(d)(2), Estate Tax Regs., if the shares are sold at a loss, such loss is a deductible expense of administration. If the shares are acquired by a beneficiary and subsequently sold by him at a loss, his loss will generally be deductible for income tax purposes. In view of the possibility of continued ownership of the mutual fund shares by the estate and the beneficiaries, and in view of the mitigating adjustments that occur if the shares are later sold at a loss, there appears to be substantial justification for the regulations using the asked price of replacement cost in valuing the mutual fund shares.

As pointed out in the Commissioner's brief, there are a number of cases holding "estate and gift tax valuation in excess of liquidation value where the asset being valued is not subject to liquidation against the holder's will is proper." *United States* v. *Ryerson*, 312 U.S. 260 (1941) ; *Guggenheim* v. *Rasquin*, 312 U.S. 254 (1941) ; *DuPont's Estate* v. *Commissioner*, 233 F. 2d 210 (C.A. 3, 1956), certiorari denied 352 U.S. 878 (1956).

We think this is one of those situations in which the principle set out by the Third Circuit Court of Appeals in *Mearkle's Estate* v. *Commissioner*, 129 F. 2d 386, is singularly applicable:

It may well be that there are several methods of valuation which could be resorted to here, and that more than one of those methods would be reasonable. One is

set out in the Regulations. * * * Quite obviously a Regulation prescribing a method for valuation is not to be stricken down by the taxpayer's preference for a different method.

Neither party has argued for any other valuation for the shares in question except either the public offering price as set in the regulations or their public redemption price as contended for by petitioner.

The case is decided for the Commissioner in accordance with the regulations.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

---

TANNENWALD, *J.*, dissenting. It may well be that shares in an open-end investment company are "a different breed of cats from ordinary stocks and bonds" but it does not follow that they are the same breed of cats as life insurance and annuity contracts. It is this assumption as to identity of "breed" which, to my mind, invalidates the decision of the majority herein.

I do not dispute the principle that respondent's regulations should be sustained unless they are unreasonable. But it does not follow that, because respondent has a choice of alternatives, his choice should be sustained where the alternative chosen is unrealistic. In such a situation the regulations embodying that choice should be held to be unreasonable. In my opinion, the regulations involved herein are clearly unrealistic as applied to the factual situation involved herein and therefore to that extent unreasonable.

The touchstone of fair market value has always been the price which a willing seller could reasonably be expected to be able to obtain from a disposition of the property in question. Thus, if shares of stock are subject to a binding restriction, which is the product of an arm's-length transaction, that the shares may not be sold without offering them to a third person at a certain price, that price becomes the ceiling for determining the fair market value of the shares for estate tax purposes. Sec. 20.2031–2(h), Estate Tax Regs.; Rev. Rul. 59–60, 1959–1 C.B. 237; see 2 Casner, Estate Planning 945–951 (1961 ed.). Similarly, when the open-market price of bonds is less than par but the bonds can be applied at par in payment of the decedent's estate tax, the par value is includable in the gross estate. *Bankers Trust Co.* v. *United States,* 284 F. 2d 537 (C.A. 2, 1960), certiorari denied 366 U.S. 903 (1961); *Candler* v. *United States,* 303 F. 2d 439 (C.A. 5, 1962).

The rationale of *Bankers Trust* was that because the bonds could be redeemed at par in payment of estate taxes, they were worth more

(i.e., the estate could reasonably be expected to obtain more) than the discounted price in the open market. It considered this an important element of value and applied respondent's own regulation that—

All relevant facts and elements of value as of the applicable valuation date should be considered *in every case*. [See 284 F. 2d at 538; sec. 20.2031–1(b), Estate Tax Regs. Emphasis supplied.]

I think the same rationale should apply here. The majority has found that, "Except for a negligible number of transfers between individuals, all transactions with respect to open-end investment companies or mutual fund shares take place with the particular open-end investment company or mutual fund whose shares are involved." "Negligible" means "of so little substance or extent or worth as to be practically nonexistent." Webster's 3rd New International Dictionary (1965). In light of the majority finding, we need not speculate on what our decision would be in a case where there was proof of some market in which the shares of an open-end investment company could be sold in addition to the availability of redemption by the company.

In the life insurance cases, the courts were obviously influenced by the facts that the insurance is a different "breed" due to the element of insurability, or lack thereof, of the insured at the time of the transfer and the significant increment which would be received on the death of the insured; that, shortly before the policy was transferred, the taxpayer had paid a substantially higher price for the insurance than its cash surrender value; and that there was no evidence that the policy could not have been sold, albeit in a limited market, at its replacement value or at least at a price in excess of its cash surrender value. *United States* v. *Ryerson*, 312 U.S. 260 (1941), decided on the same day as *Guggenheim* v. *Rasquin*, 312 U.S. 254 (1941); *DuPont's Estate* v. *Commissioner*, 233 F. 2d 210 (C.A. 3, 1956). In this connection, it is not without significance that the Internal Revenue Code itself recognizes that life insurance policies are transferable for a valuable consideration. Sec. 101(a), I.R.C. 1954.

The cases involving excise taxes (*Publicker* v. *Commissioner*, 206 F. 2d 250 (C.A. 3, 1953); *Duke* v. *Commissioner*, 200 F. 2d 82 (C.A. 2, 1952); and *Estate of Frank Miller Gould*, 14 T.C. 414 (1950)) simply decided that, in the absence of any other probative evidence of fair market value, the price that the taxpayer paid was determinative of that value. They are therefore clearly distinguishable.

The language from *Mearkle's Estate* v. *Commissioner*, 129 F.2d 386, 388 (C.A. 3, 1942), quoted in the majority opinion, must be considered in the context of the factual situation involved in that case. The question before the Court of Appeals was whether replacement cost was a proper measure for valuing annuity policies for estate tax

purposes. Citing the life insurance cases, the Court of Appeals emphasized that it had not been shown that the differences in life insurance and annuity contracts were of such significance as to justify a different method of valuation—i.e., they were "the same breed of cats." Herein lies the critical difference—in this case we have proof of a different breed.

The reference to section 20.2053-3(d)(2), Estate Tax Regs., furnishes scant, if any, support for the majority view. In the first place, the fact that respondent may have thus sought to cushion the effect of section 20.2031-8(b) does not justify a departure from the usual fair market value standard. In the second place, an equivalent countervailing loss will be available only if spread between the redemption price and the "offering price" is no less on the date of actual redemption that it was on the valuation date for estate tax purposes—a situation which is by no means guaranteed. In the third place, the loss is available only to the estate and then only under the limited conditions prescribed by the first sentence of section 20.2053-3(d)(2); [1] it is of no benefit to a beneficiary of the estate to whom the shares are distributed.

The emphasis by the majority on the fact that the estate and the beneficiaries may continue to own the mutual fund shares and thereby enjoy the benefits of ownership is, in my opinion, wholly misplaced. These possibilities exist with respect to every type of security. If the majority standard is correct, it would be no less "appropriate" to use replacement cost with respect to marketable securities of all kinds. This, however, is simply not the law. That there may be an equivalence of replacement cost and fair market value in some situations does not justify the substitution of the former for the latter as the criterion in other situations where different considerations are involved.

The plain fact is that, on the record in this case, petitioner could not dispose of the open-end investment company shares except by way of a sale to the open-end investment companies at the redemption price. That price was all that petitioner could obtain. It is the total amount obtainable by the seller from the only available actual purchaser, not the price which a theoretical purchaser would pay another seller, which should control. See Report of the Committee on Estate and Gift Taxes, 19 A.B.A. Tax Bull. 73–76 (No. 4, 1966).

I would hold for petitioner.

DRENNEN, ATKINS, FORRESTER, FAY, and IRWIN, *JJ.*, agree with this dissent.

---

[1] The first sentence of sec. 20.2053-3(d)(2), Estate Tax Regs., reads: "Expenses for selling property of the estate are deductible if the sale is necessary to pay the decedent's debts, expenses of administration, or taxes, to preserve the estate, or to effect distribution."