**EASTERN KENTUCKY WELFARE RIGHTS ORGANIZATION et al., Plaintiffs,**

**v.**

**George P. SHULTZ et al., Defendants.**

**Civ. A. No. 1378–71.**

United States District Court, District of Columbia.

Dec. 20, 1973.

Marilyn G. Rose, Los Angeles, Cal., Lauren H. Silver, Los Angeles, Cal., Anthony Z. Roisman, Washington, D. C., Thomas M. Place, Prestonsburg, Ky., Peter Axelrod, Berkeley, Cal., Ralph S. Abascal, Jay-Allen Eisen, San Francisco, Cal., for plaintiffs.

John J. McCarthy, Donald J. Gavin, Milan D. Karlan, Washington, D. C., and Harold H. Titus, Jr., U. S. Atty., of counsel, for defendants.

## MEMORANDUM OPINION

PARKER, District Judge.

In this class action against the Secretary of the Treasury and the Commissioner of Internal Revenue declaratory and injunctive relief is sought by the plaintiffs, comprising various health and welfare organizations and several private citizens, all alleging indigency and an inability to pay for hospital services. Called into question is the validity of an Internal Revenue Service (IRS or Service) policy, implemented by a revenue ruling, allowing private nonprofit hospitals to qualify as "charitable" institutions under the Internal Revenue Code of 1954 (Code) without requiring them to admit and provide free or reduced rate services to persons unable to pay. Jurisdiction of this action lies under 28 U.S.C. §§ 1331, 1340 and 1361; 28 U.S.C. §§ 2201 and 2202; and, 5 U.S.C. §§ 702 and 703.

Plaintiffs seek a declaratory judgment that the defendants have acted unlawfully in granting tax exempt status to private nonprofit hospitals as "charitable" institutions under the Code and not requiring them to admit and provide free services to indigents. They also seek an injunction prohibiting the IRS from granting or continuing to extend tax

benefits to such hospitals; to compel defendants to revoke their tax exempt status and to revoke the revenue ruling.[1]

The defendants initially moved to dismiss the complaint on the grounds that: the "Federal taxes" exemption to the Declaratory Judgment Act prevents the grant of such relief; the plaintiffs lack standing to sue; the issuance of revenue rulings may not be reviewed; the doctrine of sovereign immunity bars the suit, and; the ruling was interpretive in nature, therefore rendering the Administrative Procedure Act, 5 U.S.C. § 553 (APA), inapplicable. The motion was denied without opinion.

The matter is now presented on the plaintiffs' motion for summary judgment and the defendants' cross motion for summary judgment. The Court having considered the memoranda of points and authorities of the parties, the supporting affidavits, and the argument of counsel denies the defendants' motion and enters summary judgment on behalf of the plaintiffs.

## THE STATUTORY BACKGROUND

Section 501(a) and (c)(3)[2] of the Internal Revenue Code grants tax exempt status to charitable organizations; § 170(a) to (c)[3] permits individual and corporate donors to deduct from their income tax returns contributions to certain entities organized and operated for charitable purposes. Hospitals as such have never been specifically listed in either §§ 501 or 170 as institutions to be accorded favorable tax consideration and they were able to do so only by qualifying as "charities" under the Code. Under § 7805(a) of the Code the Commissioner of Internal Revenue is empowered to promulgate necessary rules and regulations to implement the statute. These rulings set forth the official policy of the Service and are designed to guide taxpayers, the interested public and IRS officials in tax matters.[4]

Earlier IRS policy, as expressed in Revenue Ruling 56–185, which complemented § 501, provided in substance that hospitals could qualify as charities upon showing that, in addition to satisfying the other requirements of § 501, and

---

1. Plaintiffs also seek to compel the IRS to collect all taxes due and owing because of applications of this allegedly illegal program.

2. The pertinent provisions of § 501 read as follows:

   (a) Exemption from taxation.—An organization described in subsection (c) or (d) or section 401(a) shall be exempt from taxation under this subtitle unless such exemption is denied under section 502, 503, or 504 . . .

   (c) List of exemption organizations.—The following organizations are referred to in subsection (a) : . . .

   (3) Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation, and which does not participate in, or intervene in (including the publishing or distrib-

uting of statements), any political campaign on behalf of any candidate for public office.

3. Section 170, dealing with deductions by taxpayers of Charitable contributions, in pertinent part states :

   § 170. Charitable, etc., contributions and gifts

   (a) Allowance of deduction.

   (1) General rule.—There shall be allowed as a deduction any charitable contribution (as defined in subsection (c)) payment of which is made within the taxable year. A charitable contribution shall be allowable as a deduction only if verified under regulations prescribed by the Secretary or his delegate . . .

   (c) Charitable contribution defined.—For purposes of this section, the term "charitable contribution" means a contribution or gift to or for the use of . . .

   (2) A corporation, trust, or community chest, fund, or foundation . . .

   (B) organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes or for the prevention of cruelty to children or animals . . . .

4. See footnote 10, infra.

even though permitted to assess full charges to patients capable of paying, they did not refuse treatment to indigent patients.[5] The current position of IRS which gives rise to this litigation is represented by Revenue Ruling 69–545 (Ruling). The striking feature of the 1969 ruling is the removal of that condition:

"Revenue Ruling 56–185 is hereby modified to remove therefrom the requirements relating to caring for patients without charge or at rates below cost . . . ."[6]

Allegedly suffering detrimental effects from the Ruling, plaintiffs have leveled what can be fairly categorized as a two-pronged attack upon its validity. They assert that the promulgation of the Ruling was an *ultra vires* act in that it constituted an improper administrative alteration of Internal Revenue Code provisions, in contradiction of long standing tax policy and judicial interpretation. Alternatively, assuming *arguendo* that the defendants could have validly effectuated such a substantive change, they assert that the failure to grant

5. The portions of Revenue Ruling 56–185 most relevant to this suit are:

In order for a hospital to establish that it is exempt as a public charitable organization within the contemplation of section 501(c)(3), it must, among other things, show that it meets the following general requirements . . .

It must be operated to the extent of its financial ability for those not able to pay for the services rendered and not exclusively for those who are able and expected to pay. It is normal for hospitals to charge those able to pay for services rendered in order to meet the operating expenses of the institution, without denying medical care or treatment to others unable to pay. The fact that its charity record is relatively low is not conclusive that a hospital is not operated for charitable purposes to the full extent of its financial ability. It may furnish services at reduced rates which are below cost, and thereby render charity in that manner. It may also set aside earnings which it uses for improvements and additions to hospital facilities. It must not, however, refuse to accept patients in need of hospital care who cannot pay for such services. Furthermore, if it operates with the expectation of full payment from all those to whom it renders services, it does not dispense charity merely because some of its patients fail to pay for the services rendered.

6. The pertinent provisions of Revenue Ruling 69–545 are:

Section 501(c)(3) of the Code provides for exemption from Federal income tax of organizations organized and operated exclusively for charitable, scientific, or educational purposes, no part of the net earnings of which inures to the benefit of any private shareholder or individual . . .

To qualify for exemption from Federal income tax under section 501(c)(3) of the Code, a non-profit hospital must be organized and operated exclusively in furtherance of some purpose considered "charitable" in the generally accepted legal sense of that term, and the hospital may not be operated, directly or indirectly, for the benefit of private interests.

In the general law of charity, the promotion of health is considered to be a charitable purpose. Restatement (Second), Trusts, sec. 368 and sec. 372; IV Scott on Trusts (3rd ed. 1967), sec. 368 and sec. 372. A nonprofit organization whose purpose and activity are providing hospital care is promoting health and may, therefore, qualify as organized and operated in furtherance of a charitable purpose. If it meets the other requirements of section 501(c)(3) of the Code, it will qualify for exemption from Federal income tax under section 501(a) . . .

Revenue Ruling 56–185, C.B. 1956–1, 202, sets forth requirements for exemption of hospitals under section 501(c)(3) more restrictive than those contained in this Revenue Ruling with respect to caring for patients without charge or at rates below cost. In addition, the fourth requirement of Revenue Ruling 56–185 is ambiguous in that it can be read as implying that the possibility of "shareholders" or "members" sharing in the assets of a hospital upon its dissolution will not preclude exemption of the hospital as a charity described in section 501(c)(3) of the Code. Section 1.501(c)(3)–1(b)(4) of the regulations promulgated subsequent to Revenue Ruling 56–185 makes it clear, however, that an absolute dedication of assets to charity is a precondition to exemption under section 501(c)(3) of the Code.

Revenue Ruling 56–185 is hereby modified to remove therefrom the requirements relating to caring for patients without charge or at rates below cost. Furthermore, requirement four has been modified by section 1.501(c)(3)–1(b)(4) of the regulations.

them and other interested parties the opportunities to express their views, as required by the APA and the Fifth Amendment to the Constitution, demands that the ruling be vacated and its policy abandoned.

The defendants on the other hand contend first, that the plaintiffs lack standing to sue and fail to demonstrate a sufficient nexus between the action complained of and any alleged resulting injuries, and second, that the contested promulgation is outside the scope of judicial review. As to the merits, the Service maintains that the Ruling is rationally based and must be upheld.

### STANDING

Under § 10 of the APA, 5 U.S.C. § 702, "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." This provision has been most recently interpreted in United States v. Student Challenging Regulatory Agency Procedures (SCRAP), 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973). In that proceeding plaintiff organization, comprised of four law students, challenged the propriety of an Interstate Commerce Commission decision regarding an increase in railroad freight rates without having first prepared and considered an environmental impact statement in accordance with the National Environmental Policy Act. The Supreme Court found that the requirements of § 10 of the APA were satisfied by the litigants' allegations that the agency action would have adverse economic, recreational, environmental and aesthetic effects upon its individual members. In its ruling the Court reaffirmed and expounded upon Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), which established that a person could meet the APA standing requirements only when "the challenged action had caused them 'injury in fact,' and where the alleged injury was to an interest 'arguably within the zone of interests to be protected or regulated' by the statutes that the agencies were claimed to have violated." 405 U. S. at 733, 92 S.Ct. at 1365. By way of clarification, the SCRAP Court ruled that "[a] plaintiff must allege that he has been or will in fact be perceptibly harmed by challenged agency action, not that he can imagine circumstances in which he could be affected by the agency's action." 412 U.S. at 688, 93 S.Ct. at 2416, 37 L.Ed.2d at 279.[7]

■ Plaintiffs, therefore, are confronted with a dual threshold test requiring of them a satisfactory demonstration that on basis of the pleadings first, they were injured as a result of the agency action, referred to as "injury in fact," and second, any such injury was to an interest protected by the law allegedly violated by the administrative action.

### Injury In Fact

This Court has little difficulty in finding that under the SCRAP guidelines the plaintiffs have adequately demonstrated sufficient injury flowing from the issuance of Revenue Ruling 69–545 to afford them their day in Court.

Prior to that Ruling the policy of the Service, in a very real sense, conferred a cognizable interest to indigents by requiring hospitals seeking tax advantages under the Code to give them special consideration. It simply defies common

7. As the Court noted, SCRAP's alleged injury was not, at first blush, easily demonstrable. It was alleged that the proposed rate increase would step up the use of nonrecyclable products thus requiring more natural resources to be expended from the Washington, D. C. area, where the litigants resided. This was enough, however, to overcome the courts skepticism of entertaining suits in which the pleadings were no more "than an ingenious academic exercise in the conceivable." 412 U.S. at 688, 93 S.Ct. at 2416, 37 L.Ed.2d at 270.

It was significantly noted that APA standing is not restricted to those who have been "significantly" affected by agency action. 412 U.S. 689, 93 S.Ct. 2417, 37 L.Ed.2d 270–271, n. 14.

sense to contend that the plaintiffs have remained, or will remain, unaffected by a decision which all but strips from them basic and substantial benefits which had been previously nurtured by the government. Plaintiffs and other individuals have supplied affidavits [8] recounting incidents subsequent to the present Ruling where they were denied needed hospital attention because of indigency by institutions benefiting from the applicable Code provisions and Ruling.

The government points out, and the Court is not unmindful of the fact, that plaintiffs are hard pressed to demonstrate indisputably that their inability to secure medical services was a direct consequence of the Ruling. The circumstances surrounding this litigation, however, suggest that the defendants' view of standing may be far too restrictive and unrealistic. It is obvious that while the poignant representations in the plaintiffs' affidavits do indeed reveal the severe health care crisis confronting the nation's poor, iron-clad documentation of a nexus between their tragic situation and hospital behavior towards in-

digents, as affected by the new Ruling, has not been and, in all probability, cannot be provided to the satisfaction of the criteria urged by the government. That observation notwithstanding, in light of the crucial significance with which hospitals regard their status as charities,[9] the Court does not consider itself engaged in wild speculation by assuming or recognizing that the relaxation of the requirements for charitable classification would necessarily effect hospital policy, in this case care for indigents, upon which such a status had been earlier dependent.[10]

The Court finds the correlation between agency action and injury to plaintiffs to be at least as demonstrable as that which was accepted by the SCRAP Court and accordingly concludes that the initial "injury in fact" requirement under the APA has been met.

### *Injury To A Protected Interest*

Satisfaction of the standing test further requires that these plaintiffs show that any "injury in fact" has also affected an interest protected under the Internal Revenue Code.

---

8. *See* e. g., the following affidavits, filed on April 10, 1973·; Eula Hall, Chairman, Health Committee, Eastern Kentucky Welfare Rights Organization; Lards Collins; Carolyn Block; Howard Linville, Treasurer, Association of Disabled Miners and Widows, Inc.; Rosezella Cook; Monica Hunter.

9. Consider the statement of John Alexander McMahon, President of the American Hospital Association on Tax Reform Before the House Committee on Ways and Means, April 13, 1973, submitted as exhibit to Plaintiffs Motion for Summary Judgment. Mr. McMahan stated:
   "Voluntary non profit hospitals are, in varying degrees, dependent upon charitable contributions. . . ."
   *See also*, "American United," Inc. v. Walters, 155 U.S.App.D.C. 284, 477 F.2d 1169 (D.C. Cir. 1969), in which the court recognized the importance of tax benefits to "charitable" organizations:
   "Because of the 'tax breaks' attendant to contributions to corporations qualifying under § 170(c) of the Code, qualification thereunder is a precious possession and removal from the Cumulative List, Organizations Described in Section 170(c) of the

Internal Revenue Code of 1954 is a damaging—sometimes fatal—injury to the financial status of any 'charitable' organization." 477 F.2d at 1177.

10. This analysis is supported by the very purposes for the promulgation of Revenue Rulings. In an analysis of IRS procedure, a former Chief Counsel of the Service explained that the Rulings program, consisting of letters rulings (narrowly drawn to a particular set of facts) and the more general Revenue Rulings, is designed "to provide for certainty as to the tax consequences of contemplated transactions . . . ." Rogovin, The Four R's: Regulations, Rulings, Reliance and Retroactivity A View From Within, 43 Taxes, 757, 763 (1965). These Rulings, according to Rogovin, have had a "broad impact on our national economy and on proper and reasonable tax administration." Rogovin, *supra* at 764.
   It is clear that the IRS fully expects that policy promulgated by way of Revenue Rulings will effect the taxpaying public. It may be assumed, therefore, that activities relating to one's tax position will necessarily be influenced by such IRS rulings.

The government argues that the hospitals are the sole intended beneficiaries of the "charitable" Code provisions, claiming that the plaintiffs are "once removed" from the effects of the Code thereby leaving them outside the sphere of any interests ostensibly served by the relevant sections. This argument is too simplistic.

A review of the judicial and legislative background surrounding tax treatment for charities, as made applicable to hospitals in particular, demonstrates the weakness of their position and that plaintiffs do indeed fall within the zone of interests protected by the Code.

The prior Revenue Ruling, 56–185, represented a codification of previous Code interpretations which had been accepted and approved by the courts. In an earlier 1942 case, Commissioner of Internal Revenue v. Battle Creek, 126 F.2d 405 (5th Cir. 1942), it was held that a sanitarium could properly be classified as a charitable institution under an earlier edition of the Revenue Code. As the court there explained at 406:

"[i]t is also usual for hospitals and sanitariums to charge those able to pay for service rendered, in order to pay the expenses of the institution, while not denying treatment to others unable to pay anything. Such institutions are classed as charitable."

Intercity Hospital Association v. Squire, 56 F.Supp. 472 (W.D.Wash.1944) involved the question of whether or not two hospitals were eligible for charitable treatment. The court ruled for the hospitals involved, placing significant emphasis upon the fact that "an extremely liberal rule prevailed concerning admittance of patients without funds."

This policy continued to receive favorable judicial recognition after it had been officially promulgated by the IRS in Revenue Ruling 56–185. A decision of the Tax Court in Sonora Community Hospital, 46 T.C. 519 (1966), denied tax exempt status: "the mere fact that petitioner maintained a hospital does not in and of itself justify the conclusion that it was operated exclusively for charitable purposes." 46 T.C. at 525. In Lorraine Avenue Clinic, 31 T.C. 141 (1958), an insubstantial showing of aid to the poor proved fatal to the clinic's claim of being a charitable organization.[11]

Congressional developments are also significant. In 1924 the Senate considered amending the "charitable" provisions of the then existing tax laws to enable health service organizations to automatically qualify for the relevant tax considerations. This proposal was not warmly received and was eventually abandoned.[12]

The matter was most recently weighed in connection within the 1969 tax re-

---

11. *See also* 37 A.L.R.3d 1191 (1971) for an analysis of tax exempt organizations. The following observation was made with regard to hospitals:

"It is a usual practice for a hospital to charge patients who are able to pay for the services rendered in order to maintain the institution, pay off the indebtedness on its buildings, expand its facilities, or improve its services, while not denying treatment and care to patients who are unable to pay anything." 37 A.L.R.3d at 1223. The annotation then surveyed numerous court rulings, both state and federal, which clearly revealed that charitable status, in the great majority of cases, depended upon the hospital showing, to varying quantitative degrees, that indigent patients had been admitted and treated. 37 A.L.R.3d pp. 1223–1234.

12. A proposed change to a House Bill, (H.R. 6715) under consideration by the Senate was introduced to allow for the automatic qualification of health organizations as charities. The amendment appears in parentheses:

Any corporation, or community chest, fund, or foundation, organized and operated exclusively for religious, charitable (including preventive and constructive service for relief, rehabilitation, health, character building, and citizenship), scientific, literary, or educational purposes, etc. 65 Cong.Rec. 8171 (1924)

This attempt was prompted by a ruling of the Commissioner of Internal Revenue, II–2–1128, I.T. 1800, Int.Rev.Bull. 1–2 (1923), which required relief to the poor as a condition for charitable status. The amendment was withdrawn by its sponsor, Senator Willis. 65 Cong.Rec. 8173.

form measures which included an attempt to confer hospitals with tax exempt status without regard to indigent service. The House version of the Tax Reform Act of 1969, H.R. 13270, which carried such a revision, was purportedly proposed to alleviate the "significant uncertainty as to the extent to which a hospital must accept patients who are unable to pay, in order to retain its exempt status." H.Rep.No.413, 91st Cong., 1st Sess. 43 (1969), U.S.Code Cong. & Admin.News 1969, p. 1688.[13] This explanation, made public on August 4, 1969 by the Committee on Ways and Means, preceded by approximately two months the October 8, 1969 promulgation of Revenue Ruling 69–545. Shortly thereafter, on November 21, 1969, the Senate Committee on Finance acknowledged the new Ruling but explained why the Senate Bill would *not* incorporate this revision:

> "The Internal Revenue Service has, however, issued a ruling on October 8, 1969, indicating that hospitals, if they meet all the other requirements of § 501(c)(3), are exempt under that provision, whether or not they provide charitable services on a non-cost or low-cost basis . . . . The Committee deleted from the bill those provisions which would have conformed

the Code to the result reached by the 1969 Ruling. The Committee decided to reexamine this matter in connection with pending legislation on Medicare and Medicaid." S.Rep.No.91–552, 91st Cong., 1st Sess. 61 (1969).[14]

The Senate version, as indicated by the above cited report, omitted the proposed House change. The House Conference Committee subsequently acquiesced in this determination:

> "The House Bill provides that hospitals, if they meet all the other requirements of Section 501(c)(3), are exempt under that provision, whether or not they provide charitable services on a non-cost or low-cost basis. The Senate amendment strikes out these provisions. The conference substitute . . . follows the Senate amendments." H.Rep.No.91–782. 91st Cong., 1st Sess. 289–90 (1969).

The Tax Reform Act of 1969 contained no revisions on the subject.

This analysis, cursory as it may be, sufficiently highlights the point that Congress and the judiciary have consistently insisted that the application of §§ 501 and 170 to hospitals be conditioned upon a demonstration that ameliorative consideration be given poor people in need of hospitalization. The Court cannot accept the government's conclusion

---

13. H.R.13270, 91st Cong. 1st Sess. authorized that "Section 501(c)(3) (relating to the definition of exempt organizations) is amended by inserting after 'animals', the phrase ', or for the providing of hospital care,'."

Hospitals had actively endorsed and advocated the passage of that revision. Julius M. Greisman, Attorney for the American Hospital Association, testifying . before the House Committee on Ways and Means, felt that Revenue Ruling 56–185 was difficult to administer and urged that

" . . . the tax law should be amended to provide that any hospital is exempt so long as it is operated principally for the purpose of providing hospital care." Hearings on Tax Reform Act of 1969, H.R. 13270. Before House Committee on Ways and Means, 91st Cong. 1st Sess. 1425.

14. The Senate Committee on Finance, in a Report of the Staff on Medicare and Medi-

caid, Problems, Issues and Alternatives considered in early 1970 the substance of Revenue Ruling 69–545. The staff noted that prior to the Ruling, IRS policy had provided a measure of protection against any unreasonable refusal by a nonprofit hospital to provide charitable and below-cost care: ·

"The staff strongly recommends revocation of Revenue Ruling 60–545 in light of the recent legislative history and continuation of the prior position of the Service until such time as Congress can devise an alternative approach establishing reasonable yardsticks of charitable service related to the financial capacity of a hospital. Such action by the Service would assist in protecting the availability of necessary hospital care to Medicare, Medicaid, and other poor patients." Medicare and Medicaid—Problems, Issues, and Alternatives. Report of the Staff to the Committee on Finance, U.S. Senate 91st Cong. 1st Sess. (Feb. 9, 1973).

that these Code provisions are in no way intended to aid plaintiffs and those similarly situated. To do so one would have to disregard what has been held to be the underlying rationale for allowing charitable deductions. See *e. g.*, McGlotten v. Connally, 338 F.Supp. 448, 456 (D.D.C.1972), which declared unconstitutional tax advantages granted to a fraternal order which denied membership to non-white applicants. Chief Judge Bazelon, writing for a Three-Judge District Court, appropriately noted:

"The rationale for allowing the deduction of charitable contributions has historically been that by doing so, the Government relieves itself of the burden of meeting public needs which in the absence of charitable activity would fall on the shoulders of the Government. 'The Government is compensated for its loss of revenue by its relief from financial burdens which would otherwise have to be met by appropriations from public funds.' H.Rep.No.1860, 75th Cong., 3rd Sess. 19 (1938)."

Although the above discussion in *McGlotten* focused on § 170 deductions allowed donors, it can hardly be disputed that the granting of tax exempt status to charities, pursuant to § 501(c)(3), rests upon the same foundation.

█ In view of the foregoing the Court has no trouble in concluding that plaintiffs have adequately shown that, by reason of Revenue Ruling 69–545, they have suffered injury to an interest cognizable under and protected by the "charitable" provisions of the Internal Revenue Code. The second prong of the *SCRAP* test having thus been satisfied, standing is conferred upon plaintiffs to maintain this suit.

One further observation on the standing issue seems appropriate. As a general rule, Federal court inquiry into the propriety of tax policy stems from "refund" litigation instituted by disgruntled taxpayers. Standing in those cases presents no serious problem. However, in this situation it is quite obvious that since the contested Ruling in every respect establishes criteria quite favorable to persons whose tax status will be affected, its validity could not, in all probability, be tested in that normal course. If the circumstances were reversed, i.e., were the. most stringent provisions of Rev.Rul. 56–185 to overrule those of Rev.Rul. 69–545—taxpayers denied deductions, and hospitals refused tax exempt status, would be afforded the opportunity of challenging the Ruling upon which that tax liability had been predicated. Indeed, those litigants would be able to make the very sort of argument plaintiffs in this suit have presented, namely that the Ruling is contrary to statute and therefore without effect. The fact that the administration of Revenue Ruling 69–545 will not produce protesting taxpayers eager to challenge its policy and application should not immunize the Ruling from such a testing where, as shown earlier, the Code policy it purports to serve has a fundamental purpose of aiding and benefiting the class of people to which plaintiffs belong.

The Court is not unmindful of and shares the government's concern for maintaining an efficient tax structure free from potential disruption from challenges by citizens for whom that policy has no actual tax consequence. However, the case *sub judice* presents somewhat of a unique situation in that the tax law in question also bears an identifiable relationship to citizens other than those whose tax returns are immediately affected.

█ It is also within this context that the Court, following the principles enunciated in McGlotten v. Kennedy, *supra*, at 452–454, concludes that the "Federal taxes" exemption to the Declaratory Judgment Act, 28 U.S.C. § 2201 and the Tax Injunction Act, 26 U.S.C. § 7421(a) do not bar this suit.[15]

---

15. In McGlotten, the purposes of the above restrictions on litigation—the smooth and efficient assessment and collection of taxes— were held not to have· been jeopardized by

## AUTHORITY TO PROMULGATE REVENUE RULING 69–545

■ As indicated at the outset, the defendants have maintained that the Commissioner's action is not subject to review by this Court, basing this central theme upon the "discretionary action" exception to the APA, 5 U.S.C. § 701(a)(2) which provides that:

> This chapter applies, according to the provisions thereof, except to the extent that . . . (2) agency action is committed to the agency discretion by law.[16]

The Court, however, finds this provision to be inapplicable.

■ The Supreme Court has recently held this exception to be ". . . very narrow . . . applicable in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.' S.Rep.No. 752, 79th Cong., 1st Sess. 26 (1945)." Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 410, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). To be sure, almost every administrative ruling, to some degree, flows from discretionary power vested in the executive branch. But the self-categorization of a decision as being "discretionary" does not of itself preclude court scrutiny under § 701(a)(2). The limited scope of that subseciton is further evidenced by § 706 of the APA, titled "Scope of Review," the terms of which empower a reviewing tribunal to vacate administrative determinations for "abuse of discretion." The obvious implication of that provision, as Professor Jaffe has observed, is that agency action is reviewable: ". . . *the presence of discretion should not bar a court from considering a claim of illegal or arbitrary use of discretion.*" L. Jaffe, Judicial Control of Administrative Action, 374–75 (1965) [Emphasis in original].

■■ The *Overton Park* Court keyed the applicability of this exception to whether under a particular set of circumstances, there is law to be applied by the administrator, *supra*, 401 U.S. 410, 413, 91 S.Ct. 795, and in this vein it is difficult to imagine that the deliberative process from which the policy embodied in Revenue Ruling 69–545 emerged could be properly conducted without at least some consideration and application of the legal principles attendant to the "charitable" sections of Internal Revenue Code. Indeed, the government's insistence that the action was merely interpretative undercuts its position that the Ruling falls within the § 701(a)(2) exception to review. To interpret is to explain, or to tell the meaning of—when action has the effect of changing or altering the terms of a statute the limits of "interpretation" have been overstepped. Any discretion incorporated into the IRS's authority to promulgate rules and regulations is necessarily limited by the understanding that Congress, not the Treasury, is responsible for the formulation and institution of basic tax policy. It is true, as a matter of jurisprudence and efficient tax administration, that courts have regularly paid deference to the expertise attributed to the IRS in tax related matters and therefore judicial interference has been reluctantly employed. However, this exhibition of restraint is predicated upon the assumption that administrative rulings will do no more than effectuate, implement and clarify the provisions of the Code which have been Congressionally enacted:

> "The power of an administrative officer or board to administer a federal statute and to prescribe rules and regulations to that end is not the power to make law—for no such power can be delegated by Congress—but the

plaintiffs' challenge to the constitutionality of IRS policy.

That reasoning is equally applicable in this suit.

16. Subsection (a)(1) makes exception from the general rule allowing for review where "statutes preclude judicial review." The government places no apparent reliance upon this provision.

power to adopt regulations to carry into effect the will of Congress as expressed by the statute. A regulation which does not do this, but operates to create a rule out of harmony with the statute is a mere nullity." Manhattan General Equipment Co. v. Commissioner, 297 U.S. 129, 134, 56 S.Ct. 397, 400, 80 L.Ed. 528 (1936).

See also Dixon v. United States, 381 U.S. 68, 74–75, 85 S.Ct. 1301, 14 L.Ed.2d 223 (1965) for a more recent application of this principle. When this assumption is proven wrong, the courts must act to rectify any administrative determination which is not in accord with the Code. The Ruling is therefore reviewable.

Section 706 of the APA sets forth the standards for judicial inquiry, obligating ". . . the reviewing court to engage in a substantial inquiry,"[17] the initial step of which is to determine whether the administrator "acted within the scope of his authority." *Overton Park, supra,* 401 U.S. at 415, 91 S.Ct. at 823 (citations omitted). The Court turns for guidance to several recent Supreme Court rulings which, although not brought pursuant to the APA, are nonetheless instructive as to the contours of IRS authority.[18]

It is settled law that the positions adopted by the Treasury are presumptively valid and will not ordinarily be interfered with by the courts. Bingler v. Johnson, 394 U.S. 741, 750–751, 89 S.Ct. 1439, 22 L.Ed.2d 695 (1969); United States v. Correll, 389 U.S. 299, 307, 88 S.Ct. 445, 19 L.Ed.2d 537 (1967).[19] That doctrine, however, is not automatically dispositive. As United States v. Cartwright, 411 U.S. 546, 550, 93 S.Ct. 1713, 1716, 36 L.Ed.2d 528 (1973) admonished, it ". . . is to set the framework for judicial analysis; it does not displace it." The case of Fribourg Nav. Co. v. Commissioner, 383 U.S. 272, 86 S.Ct. 862, 15 L.Ed.2d 751 (1966) is particularly well suited to offer an analytical framework and will serve as a platform for this Court's examination.

At issue in Fribourg was the soundness of IRS policy, effectuated by a revenue ruling, concerning the sale of and deductions allowable for depreciable assets. An affected taxpayer litigated the issue to culmination with the Supreme Court declaring in his favor that the IRS position was contrary to the Code and therefore invalid. Although the actual holding is, of course, of no significance to the issues presented in this

17. Section 706 provides:
    To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
    (1) compel agency action unlawfully withheld or unreasonably delayed; and
    (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
    (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
    (B) contrary to constitutional right, power, privilege, or immunity;
    (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
    (D) without observance of procedure required by law;
    (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
    (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.
    In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error. Pub.L. 89–554, Sept. 6, 1966, 80 Stat. 393.

18. The cases generally followed the refund litigation route, which as earlier indicated, would not be available to these plaintiffs. See pages 333–334, *supra.*

19. The Correll Court, in considering a challenge to a rule followed by the Commissioner of the Internal Revenue Service, held that: "The role of the judiciary in cases of this sort begins and ends with assuring that the Commissioner's regulations fall within his authority to implement the congressional mandate in some reasonable manner." 389 U.S. at 307, 88 S.Ct. at 450.

suit, the approach followed by the Supreme Court is. In reaching its determination, cognizance was taken and great weight was given to the fact that for many years the IRS had followed a fundamentally different policy which had been solidified by court as well as congressional approval.

In *Cartwright, supra,* the Supreme Court adopted a similar line of reasoning when it invalidated a treasury regulation in which the criteria for determining the valuation of mutual fund holdings for federal estate tax purposes was established. After carefully noting that regulations are generally upheld, Mr. Justice White proceeded to hold that the regulation in question was an unrealistic and unreasonable interpretation of the Internal Revenue Code. Referring to the Investment Company Act of 1940, which regulates the mutual funds field, he concluded: "Congress surely could not have intended [the pertinent section of the Code] to be interpreted in such a manner." 411 U.S. at 557, 93 S. Ct. at 1719.[20]

The reasonableness of Revenue Ruling 69–545, and the policy announced therein, therefore hinges upon whether or not it is in accord with the terms of the Code. As is usually the case, there is no clear cut disparity between the administrative ruling and the statutory language, making it necessary for the Court to discern the intended meaning and proper interpretation of the pertinent provisions. Following *Fribourg,* the Court will focus upon and give careful consideration to the relevant judicial, legislative[21] and administrative history. This provides little, if any, support for the government's position.

The defendants do not dispute that Revenue Ruling 69–545 represented, as did the revenue ruling in *Fribourg,* a clear change of previously administered policy. And the Court does not mean to imply that the Commissioner should be so inflexible as to be required, under all circumstances, to rigidly adhere to past practices. However, he may not do so without sound basis and authority. As Justice White, in his *Fribourg* dissent, observed:

> "We have frequently in the past recognized the Commissioner's authority to re-evaluate a prior position upon the basis of greater experience and reflection and to adjust that position to the extent that he becomes convinced that an adjustment is necessary *to comport with congressional intent,* even when this results in a distinct reversal of a previous position. . . ." 383 U.S. at 297, 86 S.Ct. at 876 (citations omitted; emphasis added).

The government has attempted to justify the reversal of policy as to § 501(c)(3) with reference to Professor Scott's treatise on Trusts as well as the Restatement of Trusts, for which Scott is the Reporter. Rev. Ruling 69–545 itself includes such a reference.[22] Urging that modern day "community benefit" concepts of charity, viewed in conjunction with the importance of promoting

---

**20.** The Court adopted the position of a dissenting member of the Tax Court which had earlier dealt with the challenged Regulations:

> "It does not follow that, because [the Commission] has a choice of alternatives, his choice should be sustained where the alternative chosen is unrealistic. In such a situation the regulations embodying that choice should be held to be unreasonable." 411 U.S. at 557, 93 S.Ct. at 1720, quoting from Estate of Wells v. Commissioner, 50 T.C. 871, 878 (1968).

**21.** The significance of legislative intent is further conspicuously revealed in Bingler v. Johnson, *supra.* Although the Congressional history concerning the section of the Code there involved (§ 117 exclusions from income of scholarships and fellowships) was by no means crystal clear, the Court nonetheless embarked upon an analysis of the relevant congressional history, determined what it considered to be the legislature's apparent reasoning and finally ruled that the contested Treasury Regulation comported with that meaning.

**22.** "In the general law of charity, the promotion of health is considered to be a charitable purpose. Restatement (Second), Trust, Sec. 368 and Sec. 372; IV Scott on Trusts (3rd Ed. 1967), Sec. 368 and Sec. 372." Rev.Rul. 69–545.

general health care, serve as a sufficient and rational basis for the IRS policy,[23] the Ruling is defended as a perfectly permissible interpretative determination. For judicial support reliance is placed upon Green v. Connally, 330 F.Supp. 1150 (D.D.C.1971) where Circuit Judge Leventhal, emphasizing federal and public policy considerations, ruled that private educational institutions that followed racially discriminatory practices towards students were precluded from enjoying tax benefits under §§ 501(c)(3) and 170(a) to (c). The defendants take much comfort in the following passage:

> "But clearly, the term 'charitable' is used 'in its generally accepted legal sense,' . . . and not in a street or popular sense (such as, e.g., benevolence to the poor and suffering) . . . . Thus 'strong analogy' can be derived from the general common law of charitable trusts, at least for close interpretative questions . . . ." 330 F.Supp. at 1157 (citations omitted).

The emphasis given by the IRS to Scott's principles of trust law, which the Court has no reason to doubt, was misplaced and provides, even when taken in conjunction with *Green*, an insufficient basis, in view of prior legislative and judicial history, to justify the basic shift in policy. The *Green* opinion, which of course followed the Ruling and therefore serves only as an after-the-fact basis, while perhaps pertinent for general definitional considerations, can hardly justify the Commissioner's attempt to reform the Code on an issue which had acquired a significant degree of meaning and rationale of its own. It is unnecessary to repeat in full this background but it is important to emphasize that the Ruling was promulgated simultaneously with a flourish of Congressional activity on the subject, allow-

ing one to conclude that the Service would have naturally looked to Congress for insight. The House report, which included the controversial change, was proposed on August 4, 1969; Senate rejection came in mid-November; and House adoption of the Senate revision followed shortly thereafter.

It is readily apparent that the Ruling was issued before any *final* Congressional determination had been rendered. Although at the time of promulgation the House had adopted a measure which was supportive of the Ruling, the required Senate approval had not been given. The Senate Finance Committee, which reported on its version, not only clearly stated that the matter would once again be reviewed in conjunction with Medicare and Medicaid legislation, it also gave some indication that the Committee members thought the Ruling to be in conflict with the Code:

> "The Committee deleted from the bill those provisions which would have conformed the Code to the result reached by the 1969 Ruling." S.Rep. No. 91–522, 91st Cong., 1st Sess. 61 (1969).

The IRS cannot satisfactorily demonstrate, by reason of this legislative activity, that it was supplied with a sufficiently convincing expression of Congressional intent as to warrant implementation of the sweeping policy change embodied in the Ruling.

The defendants claim, however, that Congress, being fully aware of the Ruling and its consequence, granted implied approval by failing to affirmatively reject it. The Court finds this argument unpersuasive. The legislative record, even if viewed in the light most favorable to the government, reveals that the Congress, which was by no means silent on the issue, felt uncertainty and doubt as to the propriety of the Ruling. Nor has the Court been apprised of any-

---

23. Two aspects of the Ruling have been noted in this regard: 1. that emergency rooms must remain available to *all* patients and 2. that persons who are able to pay by means of third party reimbursement must receive general hospital treatment. These conditions, however, are of no consequence to the Courts finding that the Service erred in effectuating the substantial changes found in the Ruling.

thing to indicate that the Senate was amenable to the House provisions which it deleted but felt that, in view of the Ruling, any further legislative action would be superfluous.

In short, any reading of the sequence of events to establish Congressional affirmation of the Ruling is less than persuasive and is an unacceptable basis for upholding its validity.

■ Accordingly, the Court finds that Revenue Ruling 69–545 was improperly promulgated and is without effect inasmuch as it allows private non-profit hospitals to qualify as charities under the Internal Revenue Code of 1954 without requiring the hospitals to offer special financial consideration to persons unable to pay.[24]

In view of the above holding the Court need not reach due process questions presented under the Fifth Amendment and the Administrative Procedure Act.

Counsel for plaintiffs shall present an appropriate order within 10 days.

24. The Court recognizes that Revenue Ruling 69–545 makes reference only to § 501(c)(3) and not to § 170. The Court has assumed, and the government has not argued to the contrary, that since the underlying policy considerations behind the "charitable" provisions of both sections are the same, conditions and requirements of § 501(c)(3) would apply equally to § 170.